Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
Philip Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

         Plaintiffs,

    -against-

ECNYC CO., L.L.C., MICHAEL ZWIRBLIA PSY.D. (A
Sole Proprietorship), MICHAEL ZWIRBLIA, STEPHEN
DANYKO (A Sole Proprietorship), STEPHEN DANYKO,
PRESTIGE BILLING AND COLLECTION SERVICES,
INC., YANNA VOLKOV, SVETLANA BARSKAYA,
FELIX ELINSON and JOHN DOE DEFENDANTS "1"
through "10",

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (  )

**Plaintiff Demands a Trial by
Jury**

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $433,000.00 that Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent unlawful and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including diagnostic interviews, medical record reviews, psychological testing and psychotherapy (collectively, the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.      In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $794,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of ECNYC Co. (hereinafter referred to as "ECNYC"), and its successors, Michael Zwirblia, Psy.D. (A Sole Proprietorship) (hereinafter referred to as "ZSP") and Stephen Danyko (A Sole Proprietorship) (hereinafter referred to as "DSP") (collectively, the "Fraudulent Entities"), because:

> (i)      the Fraudulent Services were allegedly provided by and billed through the Fraudulent Entities, which are healthcare "practices" not under the control and direction of their respective purported owners, Eric Cerwonka, Psy.D. ("Cerwonka"), Michael Zwirblia, Psy.D. ("Zwirblia") and Stephen Danyko, Psy.D. ("Danyko").  Rather, the Fraudulent Entities, were at all relevant times, operated, managed, and controlled by Felix Elinson ("Elinson"), the Billing Defendants and the John Doe Defendants (as defined below) for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

> (ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics (as defined below);

> (iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent they were provided at all, pursuant to pre-

2

determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)  the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

3.  Specifically, the fraudulent scheme can be described as follows:

(i)  Elinson, in association with Yanna Volkov ("Volkov"), Svetlana Barskaya ("Barskaya") and Prestige Billing and Collections Service, Inc. ("Prestige") (collectively, the "Billing Defendants") and John Doe Defendants "1" through "10" (hereinafter, the "John Doe Defendants") obtained the New York licenses, signatures and other relevant information of Zwirblia and Danyko (collectively, the "Provider Defendants") as well as Cerwonka to create and operate the Fraudulent Entities under the façade that the entities were allegedly "owned" by Cerwonka, Zwirblia and Danyko;

(ii)  Through unlawful financial arrangements, relationships were established with a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which, in actuality, were organized to supply convenient, one-stop shops for no-fault insurance fraud (hereinafter, the "Clinics");

(iii)  The Defendants arranged to have the Fraudulent Services performed by independent contractors and/or unlicensed individuals not employed by the Provider Defendants, Cerwonka, or the Fraudulent Entities at the Clinics, consisting of more than thirty-five (35) separate locations during a period of less than ten (10) months, and generated falsified reports regarding the scope of the services and the clinical findings; and

(iv)  The Defendants unlawfully used the falsified reports to submit bills for thousands of dollars per Insured per date of treatment to GEICO and other New York automobile insurance companies, seeking payment for the performance of the Fraudulent Services through the Fraudulent Entities

4.  Once the pieces were in place, Elinson, the Billing Defendants and the John Doe Defendants initially: (i) used Cerwonka's psychology license and affixed electronic copies of his signature to large quantities of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used ECNYC as a fictional healthcare

3

"practice" to serve as the billing vehicle through which more than $200,000.00 in billing for the Fraudulent Services was submitted to GEICO and other New York automobile insurers.

5.    Elinson, the Billing Defendants, and the John Doe Defendants then: (i) used Zwirblia's psychology license, tax identification number of ZSP and electronic copies of his signature to generate large volumes of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used ZSP as a fictional healthcare "practice" to serve as the billing vehicle through which more $690,000.00 in billing for the Fraudulent Services was submitted to GEICO and other New York automobile insurers.

6.    At virtually the same time, Elinson, the Billing Defendants and the John Doe Defendants: (i) used Danyko's psychology license, tax identification number of DSP and electronic copies of his signature to generate large volumes of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used DSP as a fictional healthcare "practice" to serve as the billing vehicle through which more than $320,000.00 in billing for the Fraudulent Services was submitted to GEICO and other New York automobile insurers.

7.    Because the Fraudulent Entities were nothing more than shells to hide the participation of Elinson, the Billing Defendants and the John Doe Defendants in the scheme, it was equally critical to the success of the fraudulent scheme for the Defendants to partner with New York collection attorneys who were willing to:

(i)    purport to represent the Provider Defendants, Cerwonka and the Fraudulent Entities;

(ii)    associate with Elinson, the Billing Defendants and the John Doe Defendants in connection with the unlawful scheme;

(iii)    pursue payment and collection against GEICO and other New York automobile insurers by knowingly pursuing collection lawsuits and/or

4

arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)    accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including Elinson, the Billing Defendants and the John Doe Defendants.

8.      Elinson, the Billing Defendants and the John Doe Defendants used the information received from the Provider Defendants and Cerwonka to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records; and (ii) the engagement letter and associated documents needed by the collection lawyers to collect on the Fraudulent Services.  Thereafter, Elinson and the Billing Defendants provided the package of documents associated with collection and funding efforts to the collection lawyers and thereafter, began to transfer the fabricated claim documents to them.

9.      Once the claims were compiled and submitted to GEICO, Elinson and the Billing Defendants transferred/assigned the claims to funding companies as part of an effort to exercise total and exclusive control over the Fraudulent Entities and their only assets (i.e., the income stream from the claims).  Once the documents were in place with the funding companies, money was transferred to Elinson and the John Doe Defendants, disguised as "advances" against the claims for the Fraudulent Services.  The John Doe Defendants and Elinson were not signatories to the funding agreements, received the money without risk and used the payments received from Elinson and the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

10.     As set forth herein, the Defendants at all relevant times have known that:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and

(iv)    the billing codes used by the Defendants to seek payment for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

11.     As such, the Defendants are not and have never been eligible to be compensated for the bills they have submitted through the Fraudulent Entities to GEICO.

12.     The chart annexed hereto as Exhibit "1" summarizes, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO, using the United States mail, through ECNYC.

13.     The chart annexed hereto as Exhibit "2" summarizes, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO, using the United States mail, through ZSP.

14.     The chart annexed hereto as Exhibit "3" summarizes, in part, the fraudulent charges identified to date that the Defendants have submitted, or have caused to be submitted, to GEICO, using the United States mail, through DSP.

15.     The Defendants' fraudulent scheme began no later than the year 2021 and has continued uninterrupted since that time.  The Defendants continue to pursue collection against GEICO on the Fraudulent Services through the prosecution of lawsuits and arbitrations.

16.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $433,000.00.

## THE PARTIES

### I.    Plaintiffs

17.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.  GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

18.     Defendant ECNYC is a New York general business corporation with its principal place of business in New York.

19.     Defendant Zwirblia resides in and is a citizen of New York.  At all relevant times Zwirblia was a registered clinical psychologist who purported to provide the Fraudulent Services that were billed to GEICO through ZSP in his name.

20.     Defendant Danyko resides in and is a citizen of New York.  At all relevant times Danyko was a registered clinical psychologist who purported to provide the Fraudulent Services that were billed to GEICO through DSP in his name.

21.     Defendant Prestige is a New York corporation with its principal place of business in New York.

22.     Defendants Volkov and Barskaya are citizens of New York and are the sole shareholders of Prestige.

23.     Defendant Elinson resides in and is a citizen of New Jersey.  At all relevant times, Elinson has transacted business within New York, has regularly done business in New York,

engaged in a persistent course of conduct in New York and derived substantial revenue from the alleged performance of the Fraudulent Services in New York.

24.     The John Doe Defendants are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Provider Defendants, the Fraudulent Entities, Elinson and the Billing Defendants.

**JURISDICTION AND VENUE**

25.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

26.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

27.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

28.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

29.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement**

30.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

31.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

32.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

33.    Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

34.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

35.    The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

9

36.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

37.     Unlicensed non-psychologists may <u>not</u>: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

38.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals.  <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

39.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services. <u>See</u>, <u>e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

40.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

41.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005) and <u>Andrew Carothers, M.D., P.C. v. Progressive Ins. Co</u>., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed practitioners may practice their profession in New York because of the concern that unlicensed persons are not bound by "ethical rules" that govern the quality of care.

42.    Pursuant to the No-Fault Laws, only health care providers in possession of a <u>direct</u> assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider.   The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

43.    Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services.  Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

44.    In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

45.    When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

46.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The Defendants' Fraudulent Scheme

47.    Beginning in 2021 and continuing through the present, the Defendants masterminded and implemented a complex fraudulent scheme in which the Fraudulent Entities have been used in combination, succession and interchangeably to bill GEICO more than $1.2 million for unnecessary, illusory, and otherwise non-reimbursable psychology services allegedly performed, in a period of less than ten (10) months.  In fact, ECNYC billed GEICO at least $35,000.00 per month for the Fraudulent Services allegedly provided between July of 2021 and October of 2021 (less than 3 months).  The use of ECNYC was thereafter abandoned in the end of October of 2021.  ZSP appeared soon thereafter and began to bill GEICO in November of 2021.  ZSP billed GEICO at least $60,000.00 per month for the Fraudulent Services allegedly provided between November of 2021 and May of 2022 (less than 7 months), at which time the use of ZSP was also abandoned. DSP also began billing GEICO in November 2021, billing GEICO over $109,000.00 for Fraudulent Services in that first month alone, and discontinued billing in May 2022.  The Fraudulent Entities were used by the Defendants in a "quick hit" fashion after millions of dollars were collectively billed to GEICO and other New York automobile insurers.

### A.    The Recruitment of the Provider Defendants and Cerwonka

48.    Cerwonka is a psychologist who became licensed to practice psychology in New York State in 2006.  Cerwonka previously practiced psychology in the state of Louisiana until his license to practice was revoked based on findings that his sexual relations with a patient violated Louisiana's professional practice statutes and ethical standards.

49.    Cerwonka's psychological license revocation was not the first of his legal struggles. Cerwonka had a long criminal history in the state of Rhode Island, with offenses including driving under the influence of drugs and/or alcohol, felony level fraud, and felony level drug offenses. Upon information and belief, Cerwonka passed away on October 29, 2021 in Queens, New York.

50.    Zwirblia is a psychologist who became licensed to practice psychology in New York State in 2020. Zwirblia is also no stranger to legal struggles, as he has had multiple civil judgments entered against him in the state of Illinois. Zwirblia also filed for Chapter 7 Bankruptcy in the State of Massachusetts in 2010.

51.    Zwirblia's registered address, according to the National Provider Inquiry ("NPI"), is located at 3512 Quentin Road, Brooklyn, New York, pictured below, which appears to be a multi-disciplinary medical clinic:



52.    Danyko is a psychologist who became licensed to practice psychology in New York State in 1995.

53.    At the time of the Fraudulent Scheme's commencement, Cerwonka and Zwirblia were perfect candidates for the scheme based upon their history of professional, legal and financial struggles.  Cerwonka, Zwirblia and Danyko each provided their New York licenses, signatures, and other relevant information to Elinson, the Billing Defendants and the John Doe Defendants to be misappropriated and illegally used as part of the Fraudulent Scheme against GEICO and other New York automobile insurers.

**B.      Gaining Access to Insureds**

54.    None of the Fraudulent Entities have ever had any legitimate indicia.  They never had fixed treatment locations of any kind, did not maintain stand-alone practices, were not the owners or leaseholders in the real property from which they purported to provide psychological services, did not employ their own support staff, and did not advertise or market their services to the general public.

55.    Rather, access to Insureds was obtained through the payment of kickbacks or other financial incentives to the owners/operators of more than thirty-five (35) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics").  These Clinics also purportedly housed other psychology practices that also billed GEICO for the same or similar services at or near the same time as the Fraudulent Entities.  These Clinics, include, but are not limited to the following locations:

| Clinic Address | | | ECNYC, Zwirblia and or/ Danyko Billing from Clinic | Other Psychological Providers Billing from Clinic |
|---|---|---|---|---|
| 3910 Church Avenue | Brooklyn | NY | Zwirblia | MW Psych, P.C. ("MW Psych"); Gepp Psychological Services, P.L.L.C. ("Gepp Psych"), Karin Gepp, Ph.D. ("Gepp"); Integrative Psychological Professional Services, P.L.L.C. ("IPPS"), Bruno Psychological Services, |

| | | | | |
|---|---|---|---|---|
| | | | | P.C. ("BPS"); Kate Cingel ("Cingel") |
| 60 Belmont Avenue | Brooklyn | NY | Zwirblia/Danyko | Dr. Lynn C. Tenenbaum, Ph.D. ("Tenenbaum"); North Shore South Psychological Services ("NSSPS"); Susan J. Polino, Ph.D. ("Polino"); PSG Psychology, P.L.L.C. ("PSG"); Cingel; BPS; Scott Lloyd, Ph.D. ("Lloyd"); KO NP in Psychiatry, P.C. ("KO") |
| 1122 Coney Island Avenue | Brooklyn | NY | ECNYC/Zwirblia | Gepp; Complete Neuropsychology, P.C. ("Complete Neuro"); Gepp Psych; MW Psychology, P.C. ("MW PC"); Konata Solomon Stallings ("Stallings") |
| 1120 Morris Park Avenue | Bronx | NY | Zwirblia/Danyko | MW PC; IPPS; Gepp; Gepp Psych; BPS; Cingel |
| 599-601 Southern Boulevard | Bronx | NY | Zwirblia/Danyko | Complete Neuro; Tenenbaum; Cingel; Bruno; Polino |
| 1 Fulton Avenue | Hempstead | NY | ECNYC/Zwirblia | Gepp; Bruno; Gepp Psych; Tenenbaum; Complete Neuro; Psychology 21, P.C. ("Psych 21"); Gepp; Thaina Banatte, L.M.S.W. ("Banatte"); New York Infinity Health Care, C.S.W. ("NYIHC") |
| 632 Utica Avenue | Brooklyn | NY | ECNYC/Zwirblia | MW PC; IPPS; Full Psychology, P.C. ("Full Psych"); Mel Waldman WMNY Co. ("WMNY"); Five Boroughs Psychology, P.C. ("Five Boroughs") |
| 243-51 Merrick Boulevard | Rosedale | NY | Zwirblia | IPPS; MW PC; Cingel; WMNY |
| 1849 Utica Avenue | Brooklyn | NY | ECNYC/Zwirblia/Danyko | Full Psych; Emote Medical Services, P.C. ("Emote"); |
| 4009 Church Avenue | Brooklyn | NY | ECNYC/Zwirblia | Dr. Dianna Bruno ("Bruno"); Tenenbaum |
| 148-21 Jamaica Avenue | Jamaica | NY | Zwirblia/Danyko | Complete Neuro; IPPS; MW PC; Lloyd; Pacem Psychological Services, P.C. ("PPS"); Cingel |
| 55 East 115th Street | New York | NY | Zwirblia/Danyko | Lloyd; IPPS; Stallings; PPS |
| 97-14 Rockaway Boulevard | Ozone Park | NY | Zwirblia | Emote; Metrocare Medical, P.C. ("Metrocare"); Gepp Psych; Miklos F. Losonczy ("Losonczy") |
| 92-05 Rockaway Boulevard | Jamaica | NY | ECNYC/Zwirblia | Bruno; Tenenbaum |
| 420 Doughty Boulevard | Inwood | NY | ECNYC/Zwirblia | Bruno; Tenenbaum |
| 60-40 82nd Street | Middle Village | NY | Zwirblia | Complete Neuro; WMNY; IPPS |
| 2558 Holland Avenue | Bronx | NY | Zwirblia/Danyko | NSSPS; BPS; Tenenbaum; Bruno; Polino |
| 8555 Little Neck Parkway | Floral Park | NY | ECNYC/Zwirblia | Bruno; Tenenbaum |
| 14 North Main Street | Spring Valley | NY | ECNYC/Zwirblia | Complete Neuro; Emote; Lloyd; Bruno; Tenenbaum |
| 176 Wilson Avenue | Brooklyn | NY | Zwirblia | IPPS; MW PC; PSG |
| 903 Sheridan Avenue | Bronx | NY | Zwirblia | NSSPS |
| 115 Meacham Avenue | Elmont | NY | Zwirblia | N/A |
| 700 Rockaway Turnpike | Lawrence | NY | Zwirblia | N/A |
| 156 Dolson Avenue | Middletown | NY | ECNYC | N/A |
| 208 Broadway | Newburgh | NY | ECNYC | N/A |
| 3027 Avenue V | Brooklyn | NY | ECNYC | Complete Neuro; Full Psych; Bruno |
| 3805 Church Avenue | Brooklyn | NY | ECNYC | N/A |

| 1650 Eastern Parkway | Brooklyn | NY | Danyko | Polino |
|---|---|---|---|---|
| 2386 Jerome Avenue | Bronx | NY | Danyko | Tenenbaum; Gepp; Polino; Joanne Fishman, Ph.D. ("Fishman") |
| 82-17 Woodhaven Boulevard | Ridgewood | NY | Danyko | Tenenbaum; Polino |
| 102-28 Jamaica Avenue | Richmond Hill | NY | Danyko | Stallings |
| 11 East Hawthorne Avenue | Valley Stream | NY | Danyko | Full Psych; MW Psych; IPPS |
| 1100 Pelham Parkway | Bronx | NY | Danyko | CMA Psychology, P.C. ("CMA") |
| 2354 Westchester Avenue | Bronx | NY | Danyko | Tenenbaum; BPS |
| 488 Lafayette Avenue | Brooklyn | NY | Danyko | Coney Island Psychology, P.C. |
| 560 Prospect Avenue | Bronx | NY | Danyko | Full Psych; MW Psych; IPPS |
| 652 East Fordham Road | Bronx | NY | Danyko | N/A |

56.    Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

57.    The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system. For example:

(i)    The Clinic located at 1 Fulton Avenue, Hempstead, New York (the "Fulton Avenue Clinic") was a revolving door of more than 340 purportedly different healthcare providers;

(ii)    The Clinic located at 1849 Utica Avenue, Brooklyn, New York (the "Utica Avenue Clinic") was a revolving door of more than 100 purportedly different healthcare providers;

(iii)    The Clinic located at 4009 Church Avenue, Brooklyn, New York (the "Church Avenue Clinic") was a revolving door of more than 90 purportedly different healthcare providers;

(iv)    The Clinic located at 1122 Coney Island Avenue, Brooklyn, New York (the "Coney Island Avenue Clinic") was a revolving door of more than 60 purportedly different healthcare providers; and

(v)    The Clinic located at 420 Doughty Boulevard, Brooklyn, New York (the "Doughty Boulevard Clinic") was a revolving door of more than 50 purportedly different healthcare providers.

58.    GEICO has received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

59.    In fact, many of the Clinics identified in this Complaint are the same locations where insurance fraud schemes against GEICO and other New York automobile insurers, involving fraudulent psychology treatment and billing practices, took place during the same timeframe, as illustrated below:

| Clinic Address | Range of Date(s) of Service |
|---|---|
| 1 Fulton Avenue, Hempstead | Gepp<br>January 13, 2021 – February 16, 2021<br><br>Bruno<br>February 25, 2021 – April 21, 2021<br><br>Gepp Psych<br>March 2, 2021 – April 28, 2021<br><br>Tenenbaum<br>May 5, 2021 – June 6, 2021<br><br>Complete Neuro<br>June 24, 2021 – July 8, 2021<br><br>**ECNYC**<br>**July 14, 2021 – October 27, 2021**<br><br>Psych 21<br>August 19, 2021<br><br>**Zwirblia Sole Proprietorship**<br>**November 10, 2021 – April 13, 2022** |
| 8255 Little Neck Parkway, Floral Park | Bruno<br>February 24, 2021 – March 22,2021<br><br>Tenenbaum<br>May 26, 2021<br><br>**ECNYC**<br>**July 19, 2021 – September 21, 2021**<br><br>**Zwirblia Sole Proprietorship**<br>**December 15, 2021 – March 20, 2022** |
| 14 North Main Street, Spring Valley | Complete Neuro:<br>January 4, 2021 – April 5, 2021<br><br>Bruno<br>February 16, 2021 |

| | |
|---|---|
| | Lloyd<br>March 31, 2021 – April 26, 2021<br><br>Tenenbaum<br>May 18, 2021<br><br>**ECNYC:**<br>**July 2021 – October 2021**<br><br>**Zwirblia Sole Proprietorship:**<br>**November 2021 – April 2022** |
| 420 Doughty Boulevard, Inwood | Bruno<br>February 15, 2021 – March 15, 2021<br><br>Tenenbaum<br>May 5, 2021<br><br>**ECNYC**<br>**July 23, 2021 – October 22, 2021**<br><br>**Zwirblia Sole Proprietorship**<br>**November 30, 2021 – May 11, 2022** |
| 1849 Utica Avenue, Brooklyn | Full Psych<br>January 11, 2021<br><br>**ECNYC**<br>**August 24, 2021 – September 22, 2021**<br><br>**Zwirblia Sole Proprietorship**<br>**November 8, 2021 – February 8, 2022**<br><br>**Danyko**<br>**February 1, 2022 – March 7, 2022** |
| 92-05 Rockaway Avenue, Jamaica | Bruno<br>March 1, 2021 - April 12, 2021<br><br>Tenenbaum<br>May 3, 2021<br><br>**ECNYC**<br>**July 13, 2021 – October 25, 2021**<br><br>**Zwirblia Sole Proprietorship**<br>**November 8, 2021 – May 2, 2022** |
| 4009 Church Avenue, Brooklyn | Bruno<br>February 16, 2021 – April 6, 2021<br><br>Tenenbaum<br>May 4, 2021 – May 10, 2021<br><br>**ECNYC**<br>**July 12, 2021 – October 22, 2021**<br><br>**Zwirblia Sole Proprietorship**<br>**November 23, 2021 – March 21, 2022** |
| 1122 Coney Island Avenue, Brooklyn | Gepp<br>January 14, 2021 – March 23, 2021<br><br>Gepp Psych<br>March 18, 2021 – June 10, 2021<br><br>MW Psych<br>July 1, 2021 – November 3, 2021<br><br>**ECNYC**<br>**July 22, 2021 – October 19, 2021**<br><br>Stallings<br>August 4, 2021 – September 14, 2021 |

|  | **Zwirblia Sole Proprietorship**<br>**November 10, 2021 – May 17, 2022** |
|---|---|

60.    The Clinics willingly provided access to the Defendants in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to high volumes of Insureds at the locations.

61.    In general, the referral sources at the Clinics, including the John Doe Defendants, were paid a sum of money as part of a "pay-to-play" arrangement.  Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals and access to Insureds. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to the Provider Defendants, Cerwonka, or some other mental health practitioner associated with the Fraudulent Entities who was purportedly present at the Clinic at that time, for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

62.    The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the Provider Defendants or Cerwonka, who were given access to the Clinics' offices on a transient basis pursuant to the payments made by the Defendants to the Referral Sources.

63.    The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the relationships with the referral sources, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

64.    The Defendants at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

65.    In fact, the Defendants operated the Fraudulent Entities for short periods of time and in succession and combination with one another in an effort to try and limit the billing for the Fraudulent Services submitted to GEICO and to "stay under the radar" of GEICO and other New York automobile insurers.  The Fraudulent Entities were simply three of many interchangeable entities used responsively to insurance companies' efforts to seek verification, examinations under oath and other information to try and verify the legitimacy of the services and eligibility of the multiple entities.

### C.    The Relationship Between the Fraudulent Entities

66.    The Fraudulent Entities were not separate "medical practices" but were, in fact, all operated and controlled by Elinson, the Billing Defendants and the John Doe Defendants using the same fraudulent billing and treatment protocols.

67.    In keeping with the fact that the Fraudulent Entities were operated and controlled by the same laypeople, Elinson, the Billing Defendants and the John Doe Defendants, GEICO received billing from all three Fraudulent Entities using the same "fill-in the blank" style preprinted forms and reports, for services purportedly provided at many of the same Clinics.  The following are representative examples of the form "Letter of the Medical Necessity of Psychological Testing" submitted from each of the Fraudulent Entities:

ECNYC CO

LETTER OF THE MEDICAL NECESSITY OF PSYCHOLOGICAL TESTING:

Patient's Name: ▓▓▓▓
Date of Birth:
Age:                33
Date of Accident:   6/11/2021
Date of Evaluation: 8/4/2021
Clinician: Eric Cerwonka, Psy.D.
Referred by: self-referred
Place of Service: 92-05 Rockaway Blvd., Ozone Park, NY 11417

Dear Dr. Marc R. Hilaire M.D.:

Please be advised that the above named patient was seen by me for a psychological evaluation and possible treatment due to complaints of psycho-emotional distress resulting from a motor vehicle accident on 6/11/2021.

▓▓▓▓ was seen by our psychologist on 8/4/2021 to assess the extent of psychological disturbance resulting from the accident. At that time, the patient reported experiencing a significant degree of psychological symptoms, which warranted further evaluation through a diagnostic clinical interview. Generally, the clinical interview assessed the circumstances of the event that resulted in the injuries, current and prior level of functioning, significant events in Ms. ▓▓▓▓ past, whether symptoms are a direct result of the trauma of the motor vehicle accident, and if the trauma has exacerbated any pre-existing conditions. There appears to be, as a result of the accident, significant deterioration in her psychosocial functioning, which may also impede or complicate the patient's physical recovery.

In my professional opinion, the patient needs psychological testing and psychotherapy to treat his psychological conditions developed as result of the automobile accident on 6/11/2021. Further psychological assessment (evaluation) and treatment (care) are medically necessary, reasonable, and related to the accident in question.

I hope the information provided will be helpful and will enable you to continue to process ▓▓▓▓ claim.

Respectfully submitted,

Eric Cerwonka, Psy.D.
NY State Licensed Psychologist

Page 1

---

DANYKO TESTING SERVICES
LETTER OF MEDICAL NECESSITY REGARDING PSYCHOLOGICAL TESTING

Patient's Name: ▓▓▓▓
Date of Birth:
Age:                60
Date of Accident:   10/28/2021
Date of Evaluation: 11/16/2021
Clinician: Stephen Danyko, Ph.D.
Referred by: self-referred
Place of Service: 82-17 Woodhaven Blvd, Queens NY 11385

Dear Dr. Hong Pak, M.D.,:

Please be advised that the above named patient was seen by me for a psychological evaluation and possible treatment due to complaints of psycho-emotional distress resulting from a motor vehicle accident on 10/28/2021.

▓▓▓▓ was seen by our psychologist on 11/16/2021 to assess the extent of psychological disturbance resulting from the accident. At that time, the patient reported experiencing a significant degree of psychological symptoms, which warranted further evaluation through a diagnostic clinical interview. Generally, the clinical interview assessed the circumstances of the event that resulted in the injuries, current and prior level of functioning, significant events in Ms. ▓▓▓▓ past, whether symptoms are a direct result of the trauma of the motor vehicle accident, and if the trauma has exacerbated any pre-existing conditions. There appears to be, as a result of the accident, significant deterioration in his psychosocial functioning, which may also impede or complicate the patient's physical recovery.

In my professional opinion, the patient needs psychological testing and psychotherapy to treat his psychological conditions developed as result of the automobile accident on 10/28/2021. Further psychological assessment (evaluation) and treatment (care) are medically necessary, reasonable, and related to the accident in question.

I hope the information provided will be helpful and will enable you to continue to process ▓▓▓▓ claim.

Respectfully submitted,

Stephen Danyko, Ph.D.
NY State Licensed Psychologist

Page 1

---

Michael Zwirblia Services
LETTER OF THE MEDICAL NECESSITY OF PSYCHOLOGICAL TESTING:

Patient's Name: ▓▓▓▓
Date of Birth:
Age:                33
Date of Accident:   12/31/2021.
Date of Evaluation: 1/13/2022
Clinician: Michael Zwirblia, PsyD
Referred by: Self-Referred
Place of Service: 1122 Coney Island Ave , Brooklyn, NY 11230

Dear Dr. Yassreen Khan, M.D., :
Please be advised that the above named patient was seen by me for a psychological evaluation and possible treatment due to complaints of psycho-emotional distress resulting from a motor vehicle accident on 12/31/2021.

▓▓▓▓ was seen by our psychologist on 1/13/2022 to assess the extent of psychological disturbance resulting from the accident. At that time, the patient reported experiencing a significant degree of psychological symptoms, which warranted further evaluation through a diagnostic clinical interview. Generally, the clinical interview assessed the circumstances of the event that resulted in the injuries, current and prior level of functioning, significant events in Mr. ▓▓▓▓ past, whether symptoms are a direct result of the trauma of the motor vehicle accident, and if the trauma has exacerbated any pre-existing conditions. There appears to be, as a result of the accident, significant deterioration in his psychosocial functioning, which may also impede or complicate the patient's physical recovery.

Given the aforementioned, the medical necessity for causally related psychotherapeutic treatment has been substantiated. From psychological perspective, ▓▓▓▓ required further psychological testing and treatment as it related to the accident.

I hope the information provided will be helpful and will enable you to continue to process ▓▓▓▓ claim.

Respectfully submitted,

Michael Zwirblia, PsyD
NY State Licensed Psychologist

Page 9

68.    In keeping with the fact that the Fraudulent Entities were operated and controlled by the same laypeople, Elinson, the Billing Defendants and the John Doe Defendants, GEICO received billing from two or more of the Fraudulent Entities at the following locations:

| Clinic Address | Dates of Service |
| --- | --- |
| 1 Fulton Avenue, Hempstead | ECNYC: <br> July 2021 – October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – April 2022 |
| 1122 Coney Island Avenue, Brooklyn | ECNYC: <br> July – October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – April 2022 |
| 14 North Main Street, Spring Valley | ECNYC: <br> July 2021 and September 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 |
| 1849 Utica Avenue, Brooklyn | ECNYC: <br> August 2021 – October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – March 2022 <br><br> Danyko Sole Proprietorship: <br> February 2022 – March 2022 |
| 4009 Church Avenue, Brooklyn | ECNYC: <br> July 2021 – October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – March 2022 |
| 420 Doughty Boulevard, Inwood | ECNYC: <br> July 2021 – October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – April 2022 |
| 632 Utica Avenue, Brooklyn | ECNYC: <br> September 2021 <br><br> Zwirblia Sole Proprietorship: <br> March 2022 – April 2022 |
| 8555 Little Neck Parkway, Floral Park | ECNYC: <br> July 2021 – September 2021 <br><br> Zwirblia Sole Proprietorship: <br> December 2021, March 2022 – April 2022 |
| 92-05 Rockway Boulevard, Jamaica | ECNYC: <br> July 2021 – August 2021, October 2021 <br><br> Zwirblia Sole Proprietorship: <br> November 2021 – April 2022 |
| 1120 Morris Park Avenue, Bronx | Zwirblia Sole Proprietorship: <br> March 2022 – May 2022 <br><br> Danyko Sole Proprietorship: <br> March 2022 |
| 148-21 Jamaica Avenue, Queens | Zwirblia Sole Proprietorship: <br> March 2022 <br><br> Danyko Sole Proprietorship: <br> February 2022 – March 2022 |
| 2558 Holland Avenue, Bronx | Zwirblia Sole Proprietorship: |

| | April 2022 |
| | |
| | Danyko Sole Proprietorship: |
| | May 2022 |
| 55 East 115th Street, New York | Zwirblia Sole Proprietorship: |
| | March 2022 |
| | |
| | Danyko Sole Proprietorship: |
| | April 2022 |
| 599-601 Southern Boulevard, Bronx | Zwirblia Sole Proprietorship: |
| | April 2022 – May 2022 |
| | |
| | Danyko Sole Proprietorship: |
| | November 2021 – March 2022 |
| 60 Belmont Avenue, Brooklyn | Zwirblia Sole Proprietorship: |
| | March 2022 – April 2022 |
| | |
| | Danyko Sole Proprietorship: |
| | April 2022 |

69.     Additionally, GEICO received billing from both ECNYC and ZSP for psychological services purportedly provided to the same Insured, often for the same exact services. For example:

(i)     On March 7, 2021, an Insured named DF was involved in an automobile accident. DF presented to the Clinic located at 8555 Little Neck Parkway, Floral Park, New York (the "Little Neck Parkway Clinic") and first purportedly received psychological treatment Cerwonka on July 19, 2021, for which GEICO received billing from ECNYC for the following: (i) "psychotherapy w/ patient 30 minutes" using CPT code 90832-1B (1 unit), with a charge of $148.96; and (ii) "sensory integrative techniques each 15 minutes" using CPT code 97533-1B (1 unit), with a charge of $65.77. After this purported treatment from Cerwonka, DF purportedly received an evaluation and testing from Zwirblia on December 15, 2021, for which GEICO received billing from the ZSP for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(ii)     On June 11, 2021, an Insured named TQ was involved in an automobile accident. TQ presented to the Clinic located at 92-05 Rockaway Boulevard, Jamaica, New York (the "92-05 Rockaway Boulevard Clinic") and first purportedly received an evaluation and testing from Cerwonka on August 4, 2021, for which GEICO received billing from ECNYC for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by

pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66.  After this purported testing from Cerwonka, TQ purportedly received the same evaluation and testing from Zwirblia on November 8, 2021, for which GEICO received billing from ZSP for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iii)    On September 2, 2021, an Insured named AE was involved in an automobile accident. AE presented to the Clinic located at 14 North Main Street, Spring Valley, New York (the "North Main Street Location"), and first purportedly received an evaluation and testing from Cerwonka on September 13, 2021, for which GEICO received billing from ECNYC for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66.  After this purported testing from Cerwonka, AE purportedly received the same evaluation and testing from Zwirblia on November 28, 2021, for which GEICO received billing from ZSP for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iv)    On September 28, 2021, an Insured named CR was involved in an automobile accident. CR presented to the 92-05 Rockaway Boulevard Clinic, and first purportedly received an evaluation and testing from Cerwonka on October 4, 2021, for which GEICO received billing from ECNYC for the following: (i) "pysch diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral

status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66. After this purported testing from Cerwonka, CR purportedly received the almost exact same evaluation and testing from Zwirblia on November 8, 2021, for which GEICO received billing from ZSP for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (iii) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (iv) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66; and

(v)   On October 3, 2021, an Insured named RF was involved in an automobile accident. RF presented to the 92-05 Rockaway Boulevard Clinic, and first purportedly received an evaluation and testing from Cerwonka on October 25, 2021, for which GEICO received billing from ECNYC for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66. After this purported testing from Cerwonka, RF purportedly received the same evaluation and testing from Zwirblia on November 8, 2021, for which GEICO received billing from ZSP for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66.

### D.    The Fraudulent Treatment and Billing Protocol

70.    Every Insured who was seen by the Provider Defendants or Cerwonka was subjected to a psychiatric evaluation, as well as to a virtually identical series of unnecessary psychological testing and services that were provided pursuant to a predetermined protocol.

71.     The Clinic "representatives" providing access and/or making the referrals were unlicensed individuals. Each step in the "treatment" protocol was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing for each Insured.  In fact, the battery of unnecessary psychological evaluation and psychological tests (more fully described below) which were purportedly performed, resulted in more than $1.2 million in billing to GEICO in approximately ten (10) months.

72.     When an Insured was referred to the Provider Defendants or Cerwonka pursuant to the unlawful referral arrangement, ECNYC and ZSP would systemically bill for the same combination of CPT codes.

73.     The following are representative examples of the identical CPT codes and charges utilized in billing submitted by ECNYC and the Zwirblia Sole Proprietorship:

<u>ECNYC</u>

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 2

| 15   REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| --- | --- | --- | --- | --- |
| 08/04/21 | 92-05 ROCKAWAY BLVD Ozone Park NY 11417 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 08/04/21 | 92-05 ROCKAWAY BLVD Ozone Park NY 11417 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1D (1 units) | 324.08 |
| 08/04/21 | 92-05 ROCKAWAY BLVD Ozone Park NY 11417 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (4 units) | 1,160.48 |
| 08/04/21 | 92-05 ROCKAWAY BLVD Ozone Park NY 11417 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 08/04/21 | 92-05 ROCKAWAY BLVD Ozone Park NY 11417 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

The Zwirblia Sole Proprietorship

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 2

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 01/13/22 | 1122 CONEY ISLAND AVE Brooklyn NY 11230 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 01/13/22 | 1122 CONEY ISLAND AVE Brooklyn NY 11230 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1B (1 units) | 324.08 |
| 01/13/22 | 1122 CONEY ISLAND AVE Brooklyn NY 11230 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (5 units) | 1,450.60 |
| 01/13/22 | 1122 CONEY ISLAND AVE Brooklyn NY 11230 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 01/13/22 | 1122 CONEY ISLAND AVE Brooklyn NY 11230 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

74.    Further, DSP would systemically bill virtually every Insured for the same combination of CPT codes, similar to the combination of CPT codes used by ECNYC and ZSP:

The Danyko Sole Proprietorship

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 296.26 |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (7 units) | 2,030.84 |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.64 |
| | | | TOTAL CHARGES TO DATES | $ 2432.74 |

75.    More specifically, the referral of an Insured to the Provider Defendants or Cerwonka would typically result in an initial series of charges to GEICO through the Fraudulent Entities of more than $2,000.00 per Insured based on the Fraudulent Services.

76.    Furthermore, billing submitted by the Defendants was adjusted by falsely using a 1-B modifier in an attempt to further inflate the charges for the Fraudulent Services, once again billing for the same combination of CPT codes:

## ECNYC

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 2**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 08/18/21 | 85-55 LITTLE NECK PKWY Floral Park NY 11001 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 08/18/21 | 85-55 LITTLE NECK PKWY Floral Park NY 11001 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1B (1 units) | 324.08 |
| 08/18/21 | 85-55 LITTLE NECK PKWY Floral Park NY 11001 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (4 units) | 1,160.48 |
| 08/18/21 | 85-55 LITTLE NECK PKWY Floral Park NY 11001 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 08/18/21 | 85-55 LITTLE NECK PKWY Floral Park NY 11001 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

## Zwirblia Sole Proprietorship

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 2**

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 11/10/21 | 1 FULTON AVENUE Hempstead NY 11550 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 11/10/21 | 1 FULTON AVENUE Hempstead NY 11550 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1B (1 units) | 324.08 |
| 11/10/21 | 1 FULTON AVENUE Hempstead NY 11550 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (5 units) | 1,450.60 |
| 11/10/21 | 1 FULTON AVENUE Hempstead NY 11550 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 11/10/21 | 1 FULTON AVENUE Hempstead NY 11550 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

## Danyko Sole Proprietorship

| 15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 11/17/21 | 1100 PELHAM PARKWAY Bronx NY 10461 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 296.26 |
| 11/17/21 | 1100 PELHAM PARKWAY Bronx NY 10461 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (7 units) | 2,030.84 |
| 11/17/21 | 1100 PELHAM PARKWAY Bronx NY 10461 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.64 |
| | | | TOTAL CHARGES TO DATES | $ 2432.74 |

77.     In other words, the amounts originally billed by the Defendants for the Fraudulent Services were not sufficient, so they manufactured a way to "enhance" them by further upward manipulation of the billing and associated CPT Codes.

78.     Despite the purported symptoms or lack of symptoms noted for each Insured, virtually every patient received the same treatment.  For example, with respect to ECNYC:

(i)     On December 3, 2020, an Insured named JS was involved in an automobile accident. JS then purportedly underwent an evaluation with Cerwonka at the North Main Street Clinic.  The notes from the purported evaluation indicate that during the PCS, JS reported her symptoms to include: "recurrent thoughts about the accident (thinking about the accident often), flashbacks, recurring images of the car accident, feeling weak and fatigued, trouble sleeping, headache, backache, and other aches and pains". Cerwonka then purportedly conducted the following tests on JS: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Cerwonka purportedly diagnosed JS with "pain disorder with psychological factors" and recorded the following recommendation: "Ms. Louis's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility.  In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(ii)    On June 8, 2021, an Insured named YJ was involved in an automobile accident.  YJ then purportedly underwent an evaluation with Cerwonka at the Church Avenue Clinic.  The notes from the purported evaluation indicate that during the PCS, YJ reported his symptoms to include "recurrent thoughts about the accident (thinking about the accident often), feeling anxious and fearful, feeling sad and depressed", and many other symptoms.  Cerwonka then purportedly conducted the following tests on YJ: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Cerwonka purportedly diagnosed YJ with "unspecified trauma and stressor related disorder" and recorded the following recommendation: "Yvon's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iii)   On June 27, 2021, an Insured named DG was involved in an automobile accident.  DG then purportedly underwent an evaluation with Cerwonka at the Doughty Boulevard Clinic.  The notes from the purported evaluation indicate that during the PCS, DG reported her symptoms to include "lack of awareness of surroundings, detachment, numbing", and many other symptoms.  Cerwonka then purportedly conducted the following tests on DG: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII.

Cerwonka purportedly diagnosed DG with "pain disorder with related psychological factors" and recorded the following recommendation: "Ms. Diane's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iv)    On July 10, 2021, an Insured named GG was involved in an automobile accident. GG then purportedly underwent an evaluation with Cerwonka at the Little Neck Parkway Clinic. The notes from the purported evaluation indicate that during the PCS, GG reported his symptoms to include: "recurrent thoughts about accident (thinking about the accident often), feeling anxious and fearful, feeling sad down and depressed, unstable mood, irritable feelings, feeling hopelessness, feeling weak and fatigued, trouble concentrating, trouble sleeping". Cerwonka then purportedly conducted the following tests on GG: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Cerwonka purportedly diagnosed GG with "reaction to severe stress, unspecified" and recorded the following recommendation: "Gerardo's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."; and

(v)    On August 22, 2021, an Insured named YO was involved in an automobile accident. YO then purportedly underwent an evaluation with Cerwonka at the Clinic located at 280 Broadway, Newburgh, New York (the "Broadway Clinic"). The notes from the purported evaluation indicate that during the PCS, YO reported her symptoms to include "recurrent thoughts about the accident (thinking about the accident often), feeling anxious and fearful, feeling sad, down and depressed, feeling hopelessness, flashbacks" and many other symptoms. Cerwonka then purportedly conducted the following tests on YO: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Cerwonka purportedly diagnosed YO with "major depressive disorder, single episode, mild" and recorded the following recommendation: "Ms. Orellana's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the

importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."

79.    With respect to ZSP Proprietorship:

(i)    On September 9, 2021, an Insured named AE was involved in an automobile accident.  AE then purportedly underwent an evaluation with Zwirblia at the North Main Street Clinic.  The notes from the purported evaluation indicate that during the PCS, AE reported his symptoms to include "unstable mood, feeling week and fatigued".  Zwirblia then purportedly conducted the following tests on AE: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII.  Zwirblia purportedly diagnosed AE with "adjustment disorder with anxious mood" and recorded the following recommendation: "Mr. Estabine's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(ii)    On November 9, 2021, an Insured named TE was involved in an automobile accident.  TE then purportedly underwent an initial evaluation with Zwirblia at the Coney Island Avenue Clinic.  The notes from the purported evaluation indicate that during the PCS, TE reported his symptoms to include "recurrent thoughts about the accident (thinking about the accident often), feeling anxious and fearful, irritable feelings, fear of driving or riding in a car, feeling weak and fatigued, trouble concentrating, memory problems, trouble sleeping, nightmares, distressing dreams".  Zwirblia then purportedly conducted the following tests on TE: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII.  Zwirblia purportedly diagnosed TE with "posttraumatic stress disorder" and recorded the following recommendation: "Mr. Edward's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iii)    On October 3, 2021, an Insured named DJ was involved in an automobile accident.  DJ then purportedly underwent an initial evaluation with Zwirblia

at the Fulton Avenue Clinic.  The notes from the purported evaluation indicate that during the PCS, DJ reported her symptoms to include "recurrent thoughts about the accident (thinking about the accident often), trouble sleeping, nightmares, distressing dreams, headache, backache and other aches and pains".  Zwirblia then purportedly conducted the following tests on DJ: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII.  Zwirblia purportedly diagnosed DJ with "adjustment disorders with anxiety" and recorded the following recommendation: "Ms. Joseph's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iv)    On December 17, 2021, an Insured named FC was involved in an automobile accident.  FC then purportedly underwent an initial evaluation with Zwirblia at the 92-05 Rockaway Clinic.  The notes from the purported evaluation indicate that during the PCS, FC reported her symptoms to include "feeling anxious and fearful, feeling sad, down and depressed, fear of driving or riding in a car, feeling weak and fatigued, trouble sleeping, nervousness, worry, jitteriness".  Zwirblia then purportedly conducted the following tests on FC: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Zwirblia purportedly diagnosed FC with "adjustment disorders with anxiety" and recorded the following recommendation: "Ms. Chowdhury's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."; and

(v)    On November 30, 2021, an Insured named RC was involved in an automobile accident.  RC then purportedly underwent an initial evaluation with Zwirblia at the Doughty Boulevard Clinic.  The notes from the purported evaluation indicate that during the PCS, RC reported his symptoms to include "recurrent thoughts about the accident (thinking about the accident often), detachment, numbing, absence of emotionality (having difficulty in being emotionally 'present'), feeling anxious and fearful, feeling sad, down and depressed, flashbacks, recurring images of the car accident, loss of interest and pleasure, feeling weak and fatigued, trouble concentrating, trouble sleeping, worry, jitteriness, headache, backache, and

other aches and pains". Zwirblia then purportedly conducted the following tests on RC: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Zwirblia purportedly diagnosed RC with "generalized anxiety disorder" and recorded the following recommendation: "Mr. Cabezas' responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."

80.     With respect to DSP:

(i)     On October 19, 2021, an Insured named AL was involved in an automobile accident. AL then purportedly underwent an evaluation with Danyko at the Clinic located at 2386 Jerome Avenue, Bronx, New York (the "Jerome Avenue Clinic"). The notes from the purported evaluation indicate that during the PCS, AL reported her symptoms to include "irritable feelings." Danyko then purportedly conducted the following tests on AL: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Danyko purportedly diagnosed AL with "possible unspecified trauma" and recorded the following recommendation: "Ms. Linen's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(ii)    On October 27, 2021, an Insured named LL was involved in an automobile accident. LL then purportedly underwent an evaluation with Danyko at the Clinic located at 1100 Pelham Parkway, Bronx, New York (the "Pelham Parkway Clinic"). The notes from the purported evaluation indicate that during the PCS, LL reported his symptoms to include "recurrent thoughts about accident (thinking about the accident often), feeling sad, down and depressed, flashbacks, recurring images of the car accident, memory problems, nervousness, worry, jitteriness." Danyko then purportedly conducted the following tests on LL: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Danyko purportedly diagnosed LL with "acute stress disorder" and recorded the following recommendation: "Mr. Lewis's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of

personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iii)     On October 28, 2021, an Insured named JP was involved in an automobile accident.  JP then purportedly underwent an evaluation with Danyko at the Clinic located at 8217 Woodhaven Boulevard, Ridgewood, New York (the "Woodhaven Boulevard Clinic").  The notes from the purported evaluation indicate that during the PCS, JP reported his symptoms to include "feeling anxious and fearful, feeling sad, down and depressed, unstable mood, irritable feelings."  Danyko then purportedly conducted the following tests on JP: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Danyko purportedly diagnosed JP with "unspecified trauma" and recorded the following recommendation: "Mr. Penafiel's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended.";

(iv)     On December 6, 2021, an Insured named MR was involved in an automobile accident. MR then purportedly underwent an evaluation with Danyko at the Clinic located at 599-601 Southern Boulevard, Bronx, New York (the "559-601 Southern Boulevard Clinic").  The notes from the purported evaluation indicate that during the PCS, MR reported his symptoms to include "recurrent thoughts about accident (thinking about the accident often), lack of awareness of surrounding, detachment, numbing, absence of emotionality, feeling sad, down and depressed", among other symptoms.  Danyko then purportedly conducted the following tests on MR: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII.  Danyko purportedly diagnosed MR with "acute stress disorder" and recorded the following recommendation: "Mr. Romero's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. He reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, he reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."; and

(v)    On December 21, 2021, an Insured named HB was involved in an automobile accident. HB then purportedly underwent an evaluation with Danyko at the Pelham Parkway Clinic. The notes from the purported evaluation indicate that during the PCS, HB reported her symptoms to include "recurrent thoughts about accident (thinking about the accident often), flashbacks, recurring images of the car accident." Danyko then purportedly conducted the following tests on HB: (i) PDA; (ii) TAQ; (iii) MSC-A; (iv) BDI-II; (v) BAI; and (vi) SII. Danyko purportedly diagnosed HB with "adjustment disorders, with mixed anxiety" and recorded the following recommendation: "Ms. Bertrand's responses in the interview and testing indicate acknowledgement of important problems and the perception of a need for help in dealing with these problems. She reports a positive attitude towards the possibility of personal change, the value of therapy, and the importance of personal responsibility. In addition, she reports a number of other strengths that are positive indications for a relatively smooth treatment process and reasonably good prognosis. In light of these factors, biofeedback training and psychotherapy are recommended."

81.    In keeping with the fact that the pre-determined treatment protocol utilized by the Defendants and Cerwonka to fraudulently bill GEICO for treatment and testing that was either unnecessary or never occurred, on multiple occasions, Insureds who were purportedly involved in the same motor vehicle accident received the same treatment and recommendations, regardless of their reported symptoms and diagnosis. For example, with respect to ECNYC:

(i)    On June 8, 2021, two Insureds – YJ and CM – were involved in the same automobile accident. Thereafter, YJ and CM both presented to the Church Avenue Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both YJ and CM, both with the purported service date of July 12, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(ii)    On June 27, 2021, two Insureds – DG and NG – were involved in the same automobile accident. Thereafter, DG and NG both presented to the Doughty Boulevard Clinic and were both purportedly evaluated and tested by

Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both DG and NG for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iii) On June 30, 2021, two Insureds – AR and MR – were involved in the same automobile accident. Thereafter, AR and MR both presented to the Fulton Avenue Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both AR and MR for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iv) On July 5, 2021, two Insureds – DC and DJ – were involved in the same automobile accident. Thereafter, DC and DJ both presented to the Clinic located at 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic") and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both DC and DJ for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48, with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(v) On July 10, 2021, two Insureds – SB and GG – were involved in the same automobile accident. Thereafter, both SB and GG both presented to the Little Neck Parkway Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both SB and GG, both for the purported service date of August 18, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code

96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(vi)   On August 13, 2021, three Insureds – JB, AF, and JL – were involved in the same automobile accident. Thereafter, JB, AF and JL all presented to the Utica Avenue Clinic and each were purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of JB, AF and JL for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(vii)  On August 22, 2021, three Insureds – AM, YO and SS– were involved in the same automobile accident. Thereafter, AM, YO and SS all presented to the Broadway Clinic and each were purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of AM, YO and SS, each with a purported service date of October 5, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(viii) On September 18, 2021, two Insureds – FL and DL – were involved in the same automobile accident. Thereafter, FL and DL both presented to the Church Avenue Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both FL and DL, both for the purported service date of October 6, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(ix)     On September 20, 2021, two Insureds – LB and JB – were involved in the same automobile accident. Thereafter, LB and JB both presented to the Coney Island Avenue Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both LB and JB for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66; and

(x)      On September 28, 2021, two Insureds – NP and CR – were involved in the same automobile accident. Thereafter, NP and CR both presented to the 92-05 Rockaway Boulevard Clinic and were both purportedly evaluated and tested by Cerwonka. After the purported evaluation and testing, ECNYC submitted bills on behalf of both NP and CR, both with a purported service date of October 4, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by pysch/phys" using CPT Code 96101-1B (4 units), with a charge of $1,160.48; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66.

82.    With respect to ZSP:

(i)      On August 22, 2021, two Insureds – GZ and RZ – were involved in the same automobile accident. Thereafter, GZ and RZ both presented to the Clinic located at the Little Neck Parkway Clinic and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing ZSP submitted bills on behalf of both GZ and RZ for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(ii)     On November 1, 2021, two Insureds – GT and LT – were involved in the same automobile accident. Thereafter, GT and LT presented to the 92-05 Rockaway Clinic and were both purportedly evaluated and tested by

Zwirblia.  After the purported evaluation and testing, ZSP submitted bills on behalf of both GT and LT, both with a purported service date of November 22, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iii)    On November 1, 2021, three Insureds – CA, CG and JM – were all involved in the same automobile accident. Thereafter, CA, CG and JM all presented to the Fulton Avenue Clinic, and each were purportedly evaluated and tested by Zwirblia.  After the purported evaluation and testing, ZSP submitted bills on behalf of CA, CG and JM for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(iv)    On November 3, 2021, two Insureds – JB and NC – were involved in the same automobile accident.  Thereafter, JB and NC both presented to the Clinic located at 115 Meacham Avenue, Elmont, New York (the "Meacham Avenue Clinic") and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both JB and NC for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(v)    On November 12, 2021, two Insureds – HB and HC – were involved in the same automobile accident.  Thereafter HB and HC both presented to the Coney Island Clinic and were both purportedly evaluated and tested by Zwirblia.  After the purported evaluation and testing, ZSP submitted bills on behalf of both HB and HC, both for the purported service date of November 17, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a

charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(vi)   On January 6, 2022, two Insureds – AC and YP – were involved in an automobile accident. Thereafter, AC and YP both presented to the Church Avenue Clinic and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both AC and YP, both with a purported service date of January 12, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(vii)  On January 6, 2022, two Insureds – KF and KS – were involved in the same automobile accident. Thereafter, KF and KS both presented to the Clinic located at 2558 Holland Avenue, Bronx, New York (the "Holland Avenue Clinic") and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both KF and KS, both for the purported service date of April 5, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(viii) On January 14, 2022, two Insureds – BB and NG – were involved in the same automobile accident. Thereafter, both BB and NG presented to the Doughty Boulevard Clinic and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both BB and NG, both with a purported service date of January 31, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric

evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(ix)    On January 28, 2022, three Insureds – JJ, JK and FN – were all involved in the same automobile accident. Thereafter, JJ, KJ and FN all presented to the Coney Island Avenue Clinic and were each purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of JJ, KJ and FN for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(x)    On February 4, 2022, two Insureds – SH and STH – were involved in the same automobile accident. Thereafter, SH and STH both presented to the Clinic located at 9714 Rockaway Boulevard, Ozone Park, New York (the "9714 Rockaway Boulevard Clinic") and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing ZSP submitted bills on behalf of both SH and STH, both with a purported service date of February 14, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(xi)    On February 26, 2022, three Insureds – VA, AR and JD – were involved in the same automobile accident. Thereafter, VA, AR and JD all presented to the 599-601 Southern Boulevard Clinic, and each were purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of VA, AR and JD, each for the purported service date of May 2, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(xii)    On March 2, 2022, two Insureds – NG and DS – were involved in the same automobile accident.  Thereafter, NG and DS both presented to the Utica Avenue Clinic and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both NG and DS, both with a purported service date of April 5, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(xiii)    On March 9, 2022, two Insureds – AR and JR – were involved in the same automobile accident.  Thereafter, AR and JR both presented to the Clinic located at 1120 Morris Park Avenue, Bronx, New York (the "Morris Park Avenue Clinic") and were both purportedly evaluated and tested by Zwirblia.  After the purported evaluation and testing, ZSP submitted bills on behalf of both AR and JR, both for the purported service date of March 24, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66;

(xiv)    On March 20, 2022, two Insureds – WH and TR – were both involved in the same automobile accident.  Thereafter, WH and TR both presented to the Clinic located at 60 Belmont Avenue, Brooklyn, New York (the "Belmont Avenue Location") and were both purportedly evaluated and tested by Zwirblia.  After the purported evaluation and testing, ZSP submitted bills on behalf of both WH and TR, both with a purported service date of April 4, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66; and

(xv)    On April 25, 2022, two Insureds – JM and SS – were involved in the same automobile accident.  Thereafter, JM and SS both presented to the Coney

Island Avenue Clinic and were both purportedly evaluated and tested by Zwirblia. After the purported evaluation and testing, ZSP submitted bills on behalf of both JM and SS, both for the purported service date of May 3, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $305.74; (ii) "neurobehavioral status exam" using CPT Code 96116-1B (1 unit), with a charge of $324.08; (iii) "psycho testing by psych/phys" using CPT Code 96101-1B (5 units), with a charge of $1,450.60; (v) "psycho evaluation by technician" using CPT Code 96102-1B (1 unit), with a charge of $132.04; and (v) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.66.

83.    With respect to DSP:

(i)    On August 19, 2021, two Insureds – BP and BW – were involved in the same automobile accident. Thereafter, BP and BW both presented to the Clinic located at 1650 Eastern Parkway, Brooklyn, New York (the "Eastern Parkway Clinic") and were both purportedly evaluated and tested by Danyko. After the purported evaluation and testing, DSP submitted bills on behalf of both BP and BW, both for the purported service date of November 10, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $296.26; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (7 units), with a charge of $2,030.84; and (iii) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.64;

(ii)    On October 3, 2021, two Insureds – RC and TW – were involved in the same automobile accident. Thereafter, RC and TW both presented to the Clinic located at 560 Prospect Avenue, Bronx, New York (the "Prospect Avenue Clinic") and were both purportedly evaluated and tested by Danyko. After the purported evaluation and testing, DSP submitted bills on behalf of both RC and TW, both for the purported service date of November 18, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $296.26; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (7 units), with a charge of $2,030.84; and (iii) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.64;

(iii)    On October 28, 2021, two Insureds – JP and CV – were involved in the same automobile accident. Thereafter, JP and CV both presented to the Woodhaven Boulevard Clinic and were both purportedly evaluated and tested by Danyko. After the purported evaluation and testing, DSP submitted bills on behalf of both JP and CV, both for the purported service date of November 16, 2021, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $296.26; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (7 units),

with a charge of $2,030.84; and (iii) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.64.;

(iv)    On November 9, 2021, two Insureds – CM and DS – were involved in the same automobile accident.  Thereafter, CM and DS both presented to the 599-601 Southern Boulevard Clinic and were both purportedly evaluated and tested by Danyko.  After the purported evaluation and testing, DSP submitted bills on behalf of both CM and DS, both for the purported service date of January 10, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $296.26; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (7 units), with a charge of $2,030.84; and (iii) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.64; and

(v)    On December 2, 2021, two Insureds – DC and DM – were involved in the same automobile accident.  Thereafter, DC and DM both presented to the Clinic located at 2354 Westchester Avenue, Bronx, New York (the "Westchester Avenue Clinic") and were both purportedly evaluated and tested by Danyko.  After the purported evaluation and testing, DSP submitted bills on behalf of both DC and DM, both for the purported service date of January 11, 2022, for the following: (i) "psych diagnostic evaluation" using CPT Code 90791-1B (1 unit), with a charge of $296.26; (ii) "psycho testing by psych/phys" using CPT Code 96101-1B (7 units), with a charge of $2,030.84; and (iii) "psychiatric evaluation of other records/reports" using CPT Code 90885-1B (1 unit), with a charge of $105.64.

### i.    The Fraudulent Diagnostic Interview Examinations and Charges

84.    Once an Insured was referred to one of the Provider Defendants, Cerwonka or another individual associated with the Fraudulent Entities pursuant to the unlawful referral arrangements, they initially purported to conduct a diagnostic evaluation.

85.    The diagnostic evaluation was then billed to GEICO using the name of the Fraudulent Entities using CPT code 90791-1B and a resulting charge of $305.75 with respect to ECNYC and ZSP, and a charge of $296.26 with respect to DSP.

86.    The diagnostic interview examinations were fraudulent, to the extent they were performed at all, because they were: (i) psychologically unnecessary; (ii) conducted pursuant to

the improper financial arrangements between the Defendants and the Clinics and not pursuant to the documented and clinically reasonable needs of the Insureds; and (iii) purportedly conducted by the Provider Defendants or Cerwonka, which virtually never actually happened.

87.    In addition, in the claims for diagnostic evaluations identified in Exhibits "1", "2", and "3", the bills and supporting documents falsely represented that they were legitimately performed in the first instance.

### a.    Basic, Legitimate Psychiatric Diagnostic Evaluations

88.    A psychiatric diagnostic evaluation is an integrated assessment in which a mental health practitioner elicits patient data and then uses that data to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for that patient.

89.    In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to derive a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for a patient, is elicited through a clinical interview and a mental status examination.

90.    The clinical interview is a face-to-face encounter between the mental health practitioner and the patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychiatric history, family history, and social history.

91.    The mental status examination is a structured assessment of the patient's behavioral and cognitive state.  It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, motor and speech activity, mood and affect, thought and perception, attitude, insight and judgment, orientation, attention, concentration and other cognitive areas.  Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

92.     In non-complex cases, a psychiatric diagnostic evaluation consisting of a clinical interview and a mental status examination will typically elicit patient data sufficient to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan.  In an atypical or complex case, where a mental health practitioner is unable to establish a preliminary diagnosis based on a patient interview and a mental status examination, that mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests as part of the psychiatric diagnostic evaluation.  The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately billable as psychiatric testing.

### b.     The Medically Unnecessary Diagnostic Evaluations

93.     In the claims identified in Exhibit "1", "2" and "3", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation would have been medically necessary.

94.     In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychiatric illness and/or is demonstrating emotional or behavioral symptoms that manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden change in behavior.

95.     In keeping with the fact that in the claims identified in Exhibit "1", "2" and "3" virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, nearly all of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

96.     For example, in many of the claims identified in Exhibit "1", "2" and "3", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and no one was seriously injured in the underlying accidents or injured at all.  In addition, in the vast majority of the claims identified in Exhibit "1", "2" and "3", the Insureds did not seek treatment at a hospital as the result of their accidents.

97.     It is highly improbable that these trivial "fender-benders", which virtually never resulted in serious physical injury, would have caused clinically significant psychiatric symptoms in any of the Insureds who purportedly experienced them, much less in large volumes of Insureds who happened to show up, without appointments, at one of the Clinics on the same day.

98.     The Provider Defendants and Cerwonka purported to provide the diagnostic evaluations in order to establish "clinical support" for the charges that were submitted using CPT code 90791, as well as to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychological testing".  In fact, the charges submitted through the Fraudulent Entities for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

99.     In fact, legitimate clinical interviews and mental status examinations were never actually performed and the Provider Defendants and Cerwonka simply used a series of "templated" questionnaires and forms that were limited in scope not intended to have any legitimate benefit for the Insureds that were subjected to them, and conducted in order to establish a basis for the additional Fraudulent Services to which the Provider Defendants and Cerwonka purported to subject the Insureds, including "psychological testing", as well as to establish a basis for other

medically unnecessary healthcare services that the referral sources could purport to provide to the Insureds.

100.    In keeping with the fact that the Defendants simply used a series of "templated questionnaires" which not only had no benefit for the Insureds, but are not separately payable as psychological testing, virtually every Insured purportedly evaluated and tested by the Provider Defendants or Cerwonka purportedly completed a "Psychological Symptoms Checklist", where prerecorded responses were recorded in their respective "Psychological Testing Report".

101.    Many Insureds further completed a preprinted checklist, entitled "Personal Injury **Questioneer**/Symptoms Checklist". The following are representative examples:

102.    Virtually every Insured, after purportedly completing the "Psychological Symptoms Checklist", received one of the two pre-printed rationales for completing psychological testing, with the only difference in the pre-printed rationale being whether the form referred to the minor automobile accident as "trauma" or a "distressful event".  Each Insured received these "rationales" for conducting psychological testing regardless of their purported "raw score" from the "Psychological Symptoms Checklist."  The following are representative examples:

## PRE-EVALUATION SYMPTOMS CHECKLIST (PSC):

- **Raw Score:** 3

▓▓▓▓ was involved in a serious accident in which threatened death or injury was perceived, and her symptoms are of 8 weeks duration. As of Psychological Symptoms Checklist, Posttraumatic Stress Diagnostic Scale (PDS) and Travel Anxiety Questionnaire (TAQ), the patient complained of the following:

- Trouble sleeping
- Nervousness, worry, jitteriness
- Headache, backache, and other aches and pains

Based on ▓▓▓▓ presenting signs and symptoms, the determination was made to pursue more detailed psychological assessment of the emotional, cognitive, and social sequel of Ms. ▓▓▓▓ trauma. The testing will allow us to better evaluate the patient's psychological functioning at present, facilitating the identification of risks and assisting her treatment team in prescribing the necessary treatment.

## PRE-EVALUATION SYMPTOMS CHECKLIST (PSC):

- **Raw Score:** 8

During the initial diagnostic interview ▓▓▓▓ was able to describe in detail his current symptoms profile. He reported the following symptoms using the PSC:

- Recurrent thoughts about accident (Thinking about the accident often)
- Unstable mood
- Irritable feelings
- Flashbacks, recurring images of the car accident
- Feeling weak and fatigued
- Trouble sleeping
- Nervousness, worry, jitteriness
- Headache, backache, and other aches and pains

Based on ▓▓▓▓ presenting signs and symptoms, the determination was made to pursue more detailed psychological assessment of the emotional, cognitive, and social sequelae of Mr. ▓▓▓▓ distressful event. The testing will allow us to better evaluate the patient's psychological functioning at present, facilitating the identification of risks and assisting his treatment team in prescribing the necessary treatment.

## PRE-EVALUATION SYMPTOMS CHECKLIST (PSC):

- **Raw Score:** 4

▓▓▓▓ was involved in a serious accident in which threatened death or injury was perceived, and his symptoms are of 3 weeks duration. As of Psychological Symptoms Checklist, Posttraumatic Stress Diagnostic Scale (PDS) and Travel Anxiety Questionnaire (TAQ), the patient complained of the following:

- Feeling anxious and fearful
- Feeling sad, down and depressed
- Unstable mood
- Irritable feelings

Based on ▓▓▓▓ presenting signs and symptoms, the determination was made to pursue more detailed psychological assessment of the emotional, cognitive, and social sequelae of Mr. ▓▓▓▓ trauma. The testing will allow us to better evaluate the patient's psychological functioning at present. This will facilitate the identification of risks and assist his treatment team in prescribing appropriate and necessary treatment.

103.    Irrespective of any data elicited through the putative clinical interview and mental status examination of any particular Insured, virtually every diagnostic interview examination report submitted to GEICO by the Defendants contained language that was duplicated across all other reports.  Only the Insureds' respective background information was unique to any particular patient.

104.    In virtually every case, the "Prognosis and Recommendation" section consisted of the same pre-printed narrative.  The following are representative examples from each of the Fraudulent Entities:



(Representative samples of the Defendants' diagnostic interview examination "reports" containing this identical, boilerplate language are annexed hereto as Exhibits "4", "5" and "6").

105.    Not only did the Defendants submit improper billing for the psychiatric diagnostic evaluations, they also routinely "unbundled" the charges that they submitted in order to maximize the billing to GEICO.

106.    For instance, on the same dates that the Defendants submitted charges for the psychiatric diagnostic evaluations, they routinely also submitted separate charges using CPT code 90885-1B, typically resulting in a charge of $105.66 with respect to ECNYC and ZSP, and $105.64 with respect to DSP.

107.    A healthcare provider's use of CPT code 90885 represents to an insurer that a psychologist conducted a "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges to GEICO despite the fact that any review and evaluation of an Insured's medical and psychological records would have been included and reimbursed as an element of the Insureds' psychiatric diagnostic evaluation.

108.    In other words, the Defendants cannot conduct and bill for a psychiatric diagnostic evaluation, and then bill separately for record reviews of medical or psychological records.  The following are representative examples:

## ECNYC

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 2**

| 15   REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 09/14/21 | 4009 CHURCH AVE Brooklyn NY 11203 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 09/14/21 | 4009 CHURCH AVE Brooklyn NY 11203 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1B (1 units) | 324.08 |
| 09/14/21 | 4009 CHURCH AVE Brooklyn NY 11203 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (4 units) | 1,160.48 |
| 09/14/21 | 4009 CHURCH AVE Brooklyn NY 11203 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 09/14/21 | 4009 CHURCH AVE Brooklyn NY 11203 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

## Zwirblia Sole Proprietorship

**VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE**
**PAGE 2**

| 15  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 11/30/21 | 420 DOUGHTY BLVD Inwood NY 11096 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 305.74 |
| 11/30/21 | 420 DOUGHTY BLVD Inwood NY 11096 | NEUROBEHAVIORAL STATUS EXAM | 96116 - 1B (1 units) | 324.08 |
| 11/30/21 | 420 DOUGHTY BLVD Inwood NY 11096 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (5 units) | 1,450.60 |
| 11/30/21 | 420 DOUGHTY BLVD Inwood NY 11096 | PSYCHO TESTING BY TECHNICIAN | 96102 - 1B (1 units) | 132.04 |
| 11/30/21 | 420 DOUGHTY BLVD Inwood NY 11096 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.66 |

## Danyko Sole Proprietorship

| 15.  REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY | | | | |
|---|---|---|---|---|
| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCH DIAGNOSTIC EVALUATION | 90791 - 1B (1 units) | 296.26 |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCHO TESTING BY PSYCH/PHYS | 96101 - 1B (7 units) | 2,030.84 |
| 11/16/21 | 8217 WOODHAVEN BLVD Ridgewood NY 11385 | PSYCHIATRIC EVALUATION OF OTHER RECORDS/REPORTS | 90885 - 1B (1 units) | 105.64 |
| | | | TOTAL CHARGES TO DATES | $ 2432.74 |

109.    Furthermore, the charges under CPT code 90885-1B for alleged record reviews and evaluations falsely represented that the service was performed, when in fact, neither the Provider Defendants nor Cerwonka ever reviewed or evaluated any records to support the charges.

110.    This conclusion is illustrated by the fact that although every "Letter of Medical Necessity" and "Psychological Testing Report" for each Insured indicated that the Insured was self-referred, the "Review of Medical Records" form purportedly used by the Provider Defendants and Cerwonka virtually always indicated that the records were received from the "referring doctor", and never included the non-existent referring doctor's name.  Additionally, the forms virtually always omitted even the Insured's name.  The following are representative examples:

## REVIEW OF MEDICAL RECORDS

Patient Name: _____

The following medical records were available for review from:

☐ Patient's medical file provided by referring physician

Dr. _____

☐ Police Report

The reviewed medical records was subjected to a:
- ☑ MVA
- ☐ Pedestrian vs car
- ☐ Bike vs car

Subsequent to (date of accident), the patient has developed several physical and emotional in undergoing tests and treatments for their physical and emotional condition. The patient has s

☑ No significant improvement          ☐ Some Improvement
☐ Minimal improvement                 ☐ Moderate improvement

### DIAGNOSIS:

- o M79.1 — Hypertension
- o S09.90XA — Head trauma
- o G44.309 — Posttraumatic headaches
- o S13.4 — Cervical sprain / neck
- o M50.20 — R/O Cervical disc herniation
- o 23.3XXA — Thoracic sprain
- o M51.9 — R/O Thoracic Disc Herniation
- o S39.012A — Lumbar sprain
- o M54.16 — R/O Lumbar Disc Herniation
- o M54.26 — R/O Lumbar Intervertebral disc displacement
- o S20.21GA — Chest contusion
- o S44.90 — Shoulder Sprain
- o S50.00 — Contusion Elbow
- o S63.212A — Contusion of Wrist
- o S63.90XA — Hand Sprain
- o S70.02XA — Contusion of the of the Hip
- o S73.109A — Hip sprain
- o S80.0 — Contusion of the Knee
- o S83.2 — Tear of Meniscus
- o M 23.90 — R/O Internal derangement of knee
- o S83.91 — Knee sprain
- o S93.6301 — Foot sprain
- o S409A — Ankle sprain

COMMENTS/ OTHER    *pain →Back, neck, left hip* _____

Surgery: *Denied* _____

### REVIEW OF MEDICAL RECORDS

Patient Name: _____

The following medical records were available for review from:

☑ Patient's medical file provided by referring physician

Dr. _____

☐ Police Report

The reviewed medical records was subjected to a:
- ☑ MVA
- ☐ Pedestrian vs car
- ☐ Bike vs car

Subsequent to (date of accident), the patient has developed several physical and emotional injur undergoing tests and treatments for their physical and emotional condition. The patient has sho

☑ No significant improvement          ☐ Some Improvement
☐ Minimal improvement                 ☐ Moderate improvement

### DIAGNOSIS:

- o M79.1 — Hypertension
- o S09.90XA — Head trauma
- o G44.309 — Posttraumatic headaches
- o S13.4 — Cervical sprain / neck
- o M50.20 — R/O Cervical disc herniation
- o 23.3XXA — Thoracic sprain
- o M51.9 — R/O Thoracic Disc Herniation
- o S39.012A — Lumbar sprain
- o M54.16 — R/O Lumbar Disc Herniation
- o M54.26 — R/O Lumbar Intervertebral disc displacement
- o S20.21GA — Chest contusion
- o S44.90 — Shoulder Sprain
- o S50.00 — Contusion Elbow
- o S63.212A — Contusion of Wrist
- o S63.90XA — Hand Sprain
- o S70.02XA — Contusion of the of the Hip
- o S73.109A — Hip sprain
- o S80.0 — Contusion of the Knee
- o S83.2 — Tear of Meniscus
- o M 23.90 — R/O Internal derangement of knee
- o S83.91 — Knee sprain
- o S93.6301 — Foot sprain
- o S409A — Ankle sprain

COMMENTS/ OTHER    *pain → neck into spine →* _____

Surgery: *Denied* _____

### ii.    The Fraudulent "Psychological Testing" Charges

111.    On the same day that Insureds in the claims identified in Exhibit "1", "2" and "3" were purportedly subjected to a diagnostic evaluation, the Provider Defendants and Cerwonka purported to provide those same Insureds with a battery of needless psychological tests.

112.    Despite the Insureds' respective symptoms, every Insured was purportedly subjected to the following battery of "psychological testing" and evaluations, listed in the form "Psychological Testing Report" as "Assessment Instruments and Evaluation Procedures":

    i.    Psychological Symptoms Checklist;
    ii.    Posttraumatic Stress Diagnostic Scale ("PDS");
    iii.    Travel Anxiety Questionnaire ("TAQ");
    iv.    Mental Status Checklist – Adult ("MSC-A");
    v.    Beck Depression Inventory – II ("BDI-II");
    vi.    Beck Anxiety Inventory ("BAI"); and
    vii.    Sleep Impairment Index ("SII").

113.    The Defendants then caused the psychological testing to be billed to GEICO and other New York automobile insurers under CPT code 96101-1B by:

    i.    Systematically billing for four (4) hours of testing under ECNYC, which resulted in routine charges of $1,160.48 per round of testing per Insured;

    ii.    Systematically billing for five (5) hours of testing under ZSP, which resulted in routine charges of $1,450.60 per round of testing per Insured; and

    iii.    Systematically billing for seven (7) hours of testing under DSP, which resulted in routine charges of $2,034.84 per round of testing per Insured.

114.    The Defendants further systematically billed GEICO for two additional hours of testing using ECNYC and ZSP under CPT code 96116-1B, with a charge of $324.08 and CPT code 96102-1B, with a charge of $132.04.

115.    The Defendants and Cerwonka collectively submitted over $1 million in billing for medically unnecessary psychological testing.

116.    The psychological testing was unnecessary, and conducted, to the extent it was conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

117.    In keeping with the fact that the "psychological testing" was medically and psychologically unnecessary, the vast majority of Insureds did not suffer from any clinically significant psychiatric symptoms as a result of their minor "fender benders".  Even if any of the Insureds did suffer clinically significant psychiatric symptoms as a result of their putative accidents, which they did not, in a legitimate clinical setting, the diagnostic evaluation would typically be the only service necessary to formulate a diagnosis and treatment plan for individual Insureds in non-complex psychological cases.

118.    Psychological testing is only indicated in complex psychological cases, and only where the particular testing administered is intended to augment the findings from the initial clinical interview and mental status examination and to clarify a differential diagnosis.  In fact, the fraudulent testing protocol employed by the Defendants here is contrary to the New York Workers Compensation, Behavioral Health Fee Schedule (the "Fee Schedule") ground rules, which specifically states the "Psychological Tests should not be used routinely".

119.    In the claims for "psychological testing" identified in Exhibits "1", "2" and "3", none of the Insureds who purportedly were subjected to "psychological testing" by the Provider Defendants or Cerwonka presented with complex psychiatric symptoms.

120.    Rather, each Insured, to the extent they suffered any clinically significant psychiatric symptoms as a result of a putative automobile accident, experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the alleged psychiatric symptoms in response to the accident.  In straightforward, non-complex cases such as these, the

clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

121.    Furthermore, even if the Insureds presented to the Fraudulent Entities with complex psychiatric symptoms attributable to their minor automobile accidents, which they did not, the "psychological testing" that the Provider Defendants or Cerwonka purported to provide to the Insureds would not have elicited any significant data that could not have been elicited during the clinical interview and mental status examination portions of a legitimate psychiatric diagnostic evaluation.

122.    Furthermore, as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychiatric testing.

123.    In actuality, the tests employed by the Provider Defendants and Cerwonka were merely a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the unlawful referral relationships.  The Insureds were then invited to check off the psychological symptoms they purportedly were experiencing.

124.    The Defendants would then concoct a "Psychological Testing Report".  These "reports" were templates which included the same testing with varied scores for each Insured, which, inexplicably, resulted in the same "prognosis and recommendation", as shown above, for virtually every Insured.  Representative samples of the Defendants' fraudulent "Psychological Testing Reports", containing this identical, boilerplate language are annexed hereto as Exhibits "4", "5" and "6".

125.     In particular, and as set forth above, virtually every psychological testing report resulted in a verbatim recommendation for psychotherapy and biofeedback, as well as a verbatim description of what that course of biofeedback would entail.  A representative sample of the Defendants' fraudulent psychological test reports containing this identical, boilerplate language is annexed hereto as Exhibits "4", "5" and "6".

126.     Virtually every boilerplate "psychological test report" generated by the Provider Defendants or Cerwonka concluded with a false, predetermined "diagnosis" as the result of an automobile accident.

127.     The Provider Defendants and Cerwonka issued these phony "diagnoses" regardless of the individual circumstances or unique presentation of the Insured.

128.      In actuality, the vast majority of Insureds did not suffer from any other legitimate psychological problems as the result of the minor automobile accidents they supposedly experienced, and in fact, many were given a diagnosis despite the fact that they reported that they experienced no symptoms.

129.     Neither the Provider Defendants, Cerwonka, nor any other mental health professional, ever legitimately reviewed the results of the psychological testing or legitimately created or altered any Insured's treatment plan based upon the results of the testing.  Indeed, as set forth above, regardless of any individual Insureds purported test scores, every Insured received the same boilerplate treatment plan, and only a small fraction of the Insureds actually received any follow up psychological treatment and care.

130.     Despite that the Provider Defendants, Cerwonka, nor any other mental health professional, ever legitimately reviewed the results of the psychological testing or legitimately created or altered any Insured's treatment plan based upon the results of the testing, the Defendants

affixed photocopies of the Providers' signatures and/or stamps of their name and licenses above a declaration under the penalty of perjury. The below are representative examples of same:

It is my opinion that, based upon the psychological signs and symptoms noted in this evaluation, therapeutic intervention is clinically indicated for the well-being of ▓▓▓▓

Zwirblia Michael, Psy.D.
NY State Licensed Psychologist

(This certifies that this examination was performed in compliance with customary clinical practice for psychological assessment. It is declared under penalty of perjury that the information contained within the report, which is the product of the clinician, is believed to be true and correct. Information received from others and so reported is believed to be true. This report provides a summary of the clinical assessment on the herein referenced individual and is limited to the scope of the assessment and testing situation described. While the opinion herein offered is done so within reasonable medical certainty, it is understood that such an opinion is relative only to the forensic clinical issues herein identified. It is also understood that such an opinion is constricted by time, in that the patient may have subsequently improved or deteriorated.)

It is my opinion that, based upon the psychological signs and symptoms noted in this evaluation, therapeutic intervention is clinically indicated for the well being of ▓▓▓▓

Michael Zwirblia Services
Michael Zwirblia PsyD.
NPI #11446211497
License #024266-01

Michael Zwirblia, PsyD
NY State Licensed Psychologist

(This certifies that this examination was performed in compliance with customary clinical practice for psychological assessment. It is declared under penalty of perjury that the information contained within the report, which is the product of the clinician, is believed to be true and correct. Information received from others and so reported is believed to be true. This report provides a summary of the clinical assessment on the herein referenced individual and is limited to the scope of the assessment and testing situation described. While the opinion herein offered is done so within reasonable medical certainty, it is understood that such an opinion is relative only to the forensic clinical issues herein identified. It is also understood that such an opinion is constricted by time, in that the patient may have subsequently improved or deteriorated.)

It is my opinion that, based upon the psychological signs and symptoms noted in this evaluation, therapeutic intervention is clinically indicated for the well being of ███████

_____

Eric Cerwonka, Psy.D.
NY State Licensed Psychologist

*(This certifies that this examination was performed in compliance with customary clinical practice for psychological assessment. It is declared under penalty of perjury that the information contained within the report, which is the product of the clinician, is believed to be true and correct. Information received from others and so reported is believed to be true. This report provides a summary of the clinical assessment on the herein referenced individual and is limited to the scope of the assessment and testing situation described. While the opinion herein offered is done so within reasonable medical certainty, it is understood that such an opinion is relative only to the forensic clinical issues herein identified. It is also understood that such an opinion is constricted by time, in that the patient may have subsequently improved or deteriorated.)*

It is my opinion that, based upon the psychological signs and symptoms noted in this evaluation, therapeutic intervention is clinically indicated for the well being of ███████

_____

Stephen Danyko, Ph.D.
NY State Licensed Psychologist

*(This certifies that this examination was performed in compliance with customary clinical practice for psychological assessment. It is declared under penalty of perjury that the information contained within the report, which is the product of the clinician, is believed to be true and correct. Information received from others and so reported is believed to be true. This report provides a summary of the clinical assessment on the herein referenced individual and is limited to the scope of the assessment and testing situation described. While the opinion herein offered is done so within reasonable medical certainty, it is understood that such an opinion is relative only to the forensic clinical issues herein identified. It is also understood that such an opinion is constricted by time, in that the patient may have subsequently improved or deteriorated.)*

### iii.    The Fraudulent Psychotherapy Charges

131.    Based upon the fraudulent, pre-determined outcome of the "psychological testing" and "psychiatric diagnostic evaluations", along with the phony diagnoses, the Defendants referred virtually every Insured to return for unnecessary psychotherapy sessions. Then, one of the Provider Defendants, Cerwonka, or some other individual associated with the Fraudulent Entities, purported to perform the psychotherapy.

132.    These psychotherapy sessions were billed:

(i)    Using CPT Code 90832-1B by the Fraudulent Entities, purporting to have provided thirty (30) minutes of psychotherapy to an Insured, with a charge of $148.96 with respect to ECNYC and ZSP, and $148.97 with respect to DSP;

(ii)    Using CPT Code 90834-1B by ZSP and ECNYC, purporting to have provided forty-five (45) minutes of psychotherapy to an Insured, with a charge of $199.13; and

(iii)    Using CPT Code 90837-1B by ZSP and ECNYC, purporting to have provided sixty (60) minutes of psychotherapy to an Insured, with a charge of $298.64.

133.    Like the Defendants' charges for the "psychiatric diagnostic evaluations" and "psychological testing", the charges for the psychotherapy were fraudulent in that the psychotherapy was medically and psychologically unnecessary, and was conducted, to the extent conducted at all, solely pursuant to the kickback arrangements between the Defendants and the Clinics and/or referral sources. Indeed, as set forth above, virtually every Insured who purportedly was subjected to the psychotherapy did not have any clinically significant psychological symptoms arising from their putative automobile accidents.

134.    The Defendants' charges for the psychotherapy sessions also were fraudulent because the billing represented that the services were reimbursable under CPT codes 90832, 90834, and 90837, which would have required that a licensed mental health practitioner spent 30 minutes, 45 minutes, and 60 minutes with the Insured, respectively. In fact, neither of the Provider Defendants, Cerwonka, nor any other mental health practitioner associated with the Fraudulent Entities ever spent a minimum of 30 minutes with the Insureds. Rather, the psychotherapy sessions, if ever performed, never lasted more than 15-20 minutes.

### E.  Fraudulent Misrepresentations Regarding the Identity of the Persons Performing the Fraudulent Services and Billing for Over 24 Hours on a Single Day

135.    To obtain payment for the Fraudulent Services, the Defendants also falsely represented the identities of the mental health professionals who performed the services that were billed to GEICO through the Fraudulent Entities.  More specifically, in every NF-3 submitted to GEICO, the Defendants intentionally misrepresented that the Provider Defendants or Cerwonka were the actual providers of the services.

136.    In fact, the Provider Defendants and Cerwonka virtually never performed or directly supervised the vast majority of Fraudulent Services that were allegedly provided to GEICO Insureds and billed to GEICO.  Rather, virtually all the mental health testing and services that were billed to GEICO were performed by unlicensed technicians or other persons without any legitimate supervision or oversight by the Provider Defendants, Cerwonka or any other licensed psychologist.

137.    Pursuant to New York Education Law §7605 Sect. 3 (13), an individual with a Master's level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist."  As a result, the No-Fault Law prohibited the Fraudulent Entities from recovering of no-fault benefits from the services allegedly performed by the unsupervised unlicensed technicians and independent contractors.

138.    The Defendants were well aware of the fact that the Fraudulent Entities could legitimately bill or recover for services provided by unsupervised mental health providers who were not licensed psychologists.  As such, they falsely listed one of the Provider Defendants or Cerwonka as the treating provider on every bill submitted to GEICO, and affixed photocopies of

the Provider Defendants' or Cerwonka's signature to bills to create the false appearance that they either performed or supervised the services purportedly provided.

139.    In addition, there are multiple instances for which the Fraudulent Entities submitted bills to GEICO where the services purportedly provided to Insureds by the Provider Defendants and Cerwonka for a single date of service equaled or exceeded twenty-four (24) hours, including the following dates:

| Date | Hours of Services Purportedly Provided to Insureds by Cerwonka Billed to GEICO |
| --- | --- |
| July 12, 2021 | 36 Hours |
| July 29, 2021 | 30 Hours |
| August 3, 2021 | 30 Hours |
| August 11, 2021 | 30 Hours |
| August 2, 2021 | 24 Hours |

| Date | Hours of Services Purportedly Provided to Insureds by Zwirblia Billed to GEICO |
| --- | --- |
| 11/10/2021 | 49 Hours |
| 12/16/2021 | 49 Hours |
| 11/17/2021 | 42 Hours |
| 11/22/2021 | 35 Hours |
| 12/6/2021 | 35 Hours |
| 11/24/2021 | 28 Hours |
| 12/21/2021 | 28 Hours |
| 12/27/2021 | 28 Hours |
| 1/6/2022 | 28 Hours |
| 1/20/2022 | 28 Hours |

| Date | Hours of Services Purportedly Provided to Insureds by Danyko Billed to GEICO |
| --- | --- |
| November 8, 2021 | 56 Hours |
| December 20, 2021 | 49 Hours |
| December 14, 2021 | 36.5 Hours |
| November 10, 2021 | 36 Hours |
| November 16, 2021 | 35 Hours |
| November 18, 2021 | 30 Hours |
| January 10, 2022 | 30 Hours |
| December 29, 2021 | 28 Hours |
| November 2, 2021 | 28 Hours |

140.    In keeping with the fact that it was impossible that the Provider Defendants and Cerwonka performed or supervised the services that were billed to GEICO, on various occasions the Provider Defendants purported to provide services to multiple Insureds at different Clinics located in different counties in the New York metropolitan area.  For example:

(i)  On March 22, 2022, Zwirblia purportedly provided psychological services to seven (7) different Insureds at four (4) different Clinic locations, located in three (3) different counties in the New York metropolitan area;

(ii)  On March 24, 2022, Zwirblia purportedly provided psychological services to eighteen (18) different Insureds at three (3) different Clinic locations, located in three (3) different counties in the New York metropolitan area;

(iii)  On April 5, 2022, Zwirblia purportedly provided psychological services to nineteen (19) different Insureds at five (5) different Clinic locations, located in three (3) different counties in the New York metropolitan area;

(iv)  On November 4, 2021, Danyko purportedly provided psychological services to eight (8) different Insureds at two (2) different Clinic locations, located in two (2) different counties in the New York metropolitan area; and

(v)  On November 8, 2021, Danyko purportedly provided psychological services to eight (8) different Insureds at two (2) different Clinic locations, located in two (2) different counties in the New York metropolitan area.

141.   Not only would it have been impossible for a single provider to perform over 24-hours of services in one day, but it was also impossible that the Provider Defendants or Cerwonka supervised the unlicensed technicians and/or other persons who purportedly performed over twenty-four hours of services during a single date.

142.   The number of hours, both in the aggregate and on a per day basis goes well beyond that which the Provider Defendants, Cerwoka or any group of licensed psychologists could have legitimately performed and/or supervised.

143.   What makes this scenario even more absurd is the fact that the fraudulent billing for testing and services that the Defendants submitted or caused to be submitted to GEICO constituted only a fraction of the total fraudulent billing for psychological evaluations, testing, and services submitted through the Fraudulent Entities to all automobile insurers in the New York automobile insurance market.  The instances identified above only address billing from GEICO

and do not include other automobile insurers, which, if counted, would make the hours two to three times greater if they received similar billing to that received by GEICO.

**F.      The Fraudulent Use of the "1B" Modifier in Billing**

144.      The fraudulent scheme also included the submission of claims to GEICO including a "1B" modifier, in order to further maximize the fraudulent reimbursement that they could extract from GEICO.

145.      Pursuant to the CPT codes set forth in the Fee Schedule, a "1B" modifier, "provides a 20 percent reimbursement increase for providers with the following WCB [Worker's Compensation Board] assigned provider rating codes: PN-P (Psychiatry), PN-ADP (Addiction Psychiatry), PN-PM (Pain Management), and PSY (Psychology)."

146.      As a part of the fraudulent scheme, the Defendants increased the charges submitted to GEICO by utilizing the "1B" modifier.

147.      The utilization of the "1B" modifier in bills submitted to GEICO allowed the Defendants to increase the already fraudulent charges across the battery of Fraudulent Charges, furthering their fraudulent scheme to extract payments from GEICO to which they were never entitled.

**G.      The Fraudulent Billing for Independent Contractor Services**

148.      The Defendants' fraudulent scheme also included the submission of claims to GEICO in the name of the Fraudulent Entities seeking payment for services provided by individuals that they never employed.

149.      Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by

independent contractors; the healthcare services must be provided by the billing provider itself, or by its employees.

150.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

151.    From July of 2021 to May of 2022 (less than 10 months), the Defendants submitted more than 550 separate bills to GEICO seeking payment for the Fraudulent Services purportedly performed by individuals other than the Provider Defendants and Cerwonka, while falsely representing in almost every bill that one of the Provider Defendants or Cerwonka were the provider of the service in question.  This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who actually performed the services and their relationship to the Fraudulent

Entities, that Elinson, the Billing Defendants, and the John Doe Defendants were unlawfully operating and controlling.

152.    In fact, every NF-3 form submitted to GEICO, by or on behalf of the Defendants, falsely represented that one of the Provider Defendants or Cerwonka, as the owner of each respective practice, had actually performed the service.   The following are representative examples:

### ECNYC

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 3

| 16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| CERWONKA, ERIC RONALD | PSY | 016645-01 | | ☐ | Owner |

### Zwirblia Sole Proprietorship

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 3

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING. | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| ZWIRBLIA, MICHAEL | PsyD | 024066-01 | | ☐ | Owner |

### Danyko Sole Proprietorship

| 16 IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| DANYKO, STEPHEN J | PSY, Ph D | 012250-01 | | | Owner |

153.    Additionally, every NF-3 form submitted to GEICO by the Defendants falsely represented that one of the Provider Defendants or Cerwonka, as the owner of the practice, had actually reviewed and approved the billing for the services, as well as the AOBs (assignment of

benefits forms) that would have enabled direct payment to have been made to the sole proprietorship for services allegedly rendered to the patient.

154.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians or independent contractors, who performed the Fraudulent Services were never: (i) employed by the Provider Defendants or Cerwonka and the Fraudulent Entities; (ii) under their direction and/or control; or (iii) paid by the Provider Defendants or Cerwonka.

155.    Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by the Provider Defendants, Cerwonka and/or the Fraudulent Entities, the Defendants never had any right to bill or to collect No-fault benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all of the others identified in this complaint.   The misrepresentations and acts of fraudulent concealment outlined in this complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services, when, in fact, GEICO was not.

## III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

156.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms, reports, assignment of benefits and other documents in the names of the Fraudulent Entities seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

157.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented that the Fraudulent Entities were owned and controlled by the Provider Defendants and/or Cerwonka, when in fact at all relevant times the Fraudulent Entities were serenely owned, operated, managed and controlled by Elinson, the Billing Defendants and the John

Doe Defendants for the purposes of effectuating a large-scale fraudulent scheme on GEICO and other New York automobile insurers;

(ii)     The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented that the Fraudulent Services provided, to the extent provided at all, were medically necessary and clinically indicated, when in fact, the Fraudulent Services were provided pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements established between the Defendants and the Clinics;

(iii)    The NF-3 Forms and other supporting documentation submitted to GEICO uniformly misrepresented to GEICO that the Fraudulent Services were medically or psychologically necessary, when, in fact, the Fraudulent Services were not medically or psychologically necessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    The NF-3 Forms and other supporting documentation uniformly misrepresented to GEICO the nature and level of services that were purportedly provided in order to inflate the charges submitted to GEICO;

(v)     The NF-3 forms and other supporting documentation submitted uniformly misrepresented to GEICO that the Fraudulent Services were provided by the Provider Defendants and/or Cerwonka, when in fact they were provided by unlicensed persons and/or independent contractors, in contravention of New York law; and

(vi)    The NF-3 forms and other supporting documentation submitted uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by independent contractors and/or unlicensed individuals not employed by the Fraudulent Entities.

## IV.    <u>Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>

158.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

159.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme and went to great lengths to accomplish this concealment.

160.     Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of the Provider Defendants and Cerwonka in order to prevent GEICO from discovering that, at all relative times, the Fraudulent Entities were unlawfully operated, managed and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

161.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent entities derived their patient referrals through financial payments that the Defendants made to the Clinics/referral sources.  Indeed, the Defendants entered into complex financial arrangements with the Clinics/referral sources that were designed to, and did, conceal the nature of the financial and referral arrangements.

162.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols that maximized the charges that the Defendants could submit to GEICO.

163.     Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically and psychologically unnecessary and were often performed, to the extent performed at all, by (i) unlicensed persons in contravention of New York law; and (ii) individuals who were not employed by the Fraudulent Entities.

164.    The Defendants hired law firms to pursue collection of the charges from GEICO. These law firms routinely filed expensive and time-consuming litigation against GEICO if the charges were not promptly paid in full.

165.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid, verified documents submitted to GEICO in support of the charges at issue, combined with the material misrepresentations and litigation activity described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $433,000.00 dollars based upon payments made by GEICO in reliance on the charges that the Defendants submitted.

166.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against the Fraudulent Entities**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

167.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 166 above.

168.    There is an actual case and controversy between GEICO and the Fraudulent Entities, regarding more than $794,000.00 in pending billing submitted through the Fraudulent Entities.

169.    The Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Entities are healthcare "practices" that were not at the relevant times, under the control and direction of the Provider Defendants and Cerwonka, but

rather, were secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers.

170.    The Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

171.    The Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

172.    The Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO through the Fraudulent Entities because, in many cases, the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

173.    The Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO through the Fraudulent Entities because the Fraudulent Services were: (i) provided by unlicensed individuals, in contravention of New York law; and/or (ii) provided by individuals who were not employed by the Fraudulent Entities.

174.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Fraudulent Entities have no right to receive

payment for any pending bills submitted to GEICO because: (i) the Fraudulent Entities are healthcare "practices" that were not at the relevant times, under the control and direction of the Provider Defendants and Cerwonka, but rather, were secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the Fraudulent Services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the Fraudulent Services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the Fraudulent Services were (a) provided by unlicensed individuals, in contravention of New York law, and/or (b) provided by individuals who were not employed by the Fraudulent Entities.

### SECOND CAUSE OF ACTION
**Against Elinson, the Billing Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

175.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 174 above.

176.    ECNYC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

177.    Elinson, the Billing Defendants and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of ECNYC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that ECNYC was not eligible to receive under the New York no-fault insurance law because:  (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Cerwonka, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by ECNYC.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

178.    Each such mailing was made in furtherance of the mail fraud scheme. ECNYC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Elinson, the Billing Defendants and the John Doe Defendants operated ECNYC, insofar as ECNYC is not engaged in a legitimate psychology practice and acts of mail fraud therefore are essential for ECNYC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Elinson, the Billing Defendants and the John Doe Defendants continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through ECNYC to the present day.

179.    ECNYC has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through ECNYC in pursuit of inherently unlawful goals, namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

180.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $149,000.00 pursuant to the fraudulent bills submitted through ECNYC.

181.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Elinson, the Billing Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 181 above.

183.    ECNYC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

184.    Elinson, the Billing Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ECNYC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that ECNYC was not entitled to receive under the New York no-fault laws because:  (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Cerwonka, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first

instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by ECNYC.  The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".  Each such mailing was made in furtherance of the mail fraud scheme.

185.    Elinson, the Billing Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

186.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $149,000.00 pursuant to the fraudulent bills submitted through ECNYC.

187.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against ECNYC, Elinson, the Billing Defendants and the John Doe Defendants**
**(Common Law Fraud)**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 187 above.

189.    Elinson, ECNYC, the Billing Defendants and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed

material facts from GEICO in the course of ECNYC's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

190.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that ECNYC was legitimately owned and controlled by Cerwonka, when in fact it was owned, operated, controlled and managed by Elinson, the Billing, Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme of GEICO and other New York automobile insurers;

(ii)    In every claim, the representation that the services that were billed were actually provided when in fact they were not;

(iii)   In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to unlawful kickback and/or financial arrangements amongst the Defendants and others;

(iv)    In every claim, the representation that the psychological services were provided by Cerwonka, when in fact the services were provided by unsupervised, unlicensed persons or independent contractors; and

(v)     In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they performed and billed pursuant to fraudulent predetermined protocols involving the dictates of unlicensed persons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

191.    Elinson, ECNYC, the Billing Defendants and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ECNYC that were not compensable under New York no-fault insurance laws.

192.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $149,000.00 pursuant to the

fraudulent bills submitted by Elinson, the Billing Defendants and the John Doe Defendants in the name of ECNYC.

193.    The extensive fraudulent conduct by Elinson, ECNYC, the Billing Defendants and the John Doe Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

194.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

195.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 194 above.

196.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

197.    When GEICO paid the bills and charges submitted by or on behalf of ECNYC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

198.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

199.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

200.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $149,000.00.

### SIXTH CAUSE OF ACTION
**Against Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants
(Violation of RICO, 18 U.S.C. § 1962(c))**

201.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 200 above.

202.    ZSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

203.    Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of ZSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that ZSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Zwirblia, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to

financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by ZSP. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

204. ZSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants operated ZSP, insofar as ZSP is not engaged in a legitimate psychology practice and acts of mail fraud, therefore, are essential for ZSP to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Zwirblia, Elinson the Billing Defendants and the John Doe Defendants continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through ZSP to the present day.

205. ZSP has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through ZSP in pursuit of inherently unlawful goals, namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

206.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $142,000.00 pursuant to the fraudulent bills submitted through ZSP.

207.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper

### SEVENTH CAUSE OF ACTION
**Against Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

208.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 207 above.

209.     ZSP is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

210.     Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of ZSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that ZSP was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Zwirblia, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or

referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by ZSP. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

211. Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

212. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $142,000.00 pursuant to the fraudulent bills submitted through ZSP.

213. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Zwirblia, ZSP, Elinson, the Billing Defendants and the John Doe Defendants
### (Common Law Fraud)

214.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 213 above.

215.    Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of ZSP's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

216.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that ZSP was legitimately owned and controlled by Zwirblia, when in fact it was owned, operated, controlled and managed by Elinson, the Billing Defendants and the John Doe Defendants for the purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    In every claim, the representation that the services that were billed were actually provided when in fact they were not;

(iii)   In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to unlawful kickback and/or financial arrangements amongst the Defendants and others;

(iv)    In every claim, the representation that the psychological services were provided by Zwirblia, when in fact the services were provided by unsupervised, unlicensed technicians and independent contractors; and

(v)     In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they were performed and billed pursuant to fraudulent predetermined protocols involving the dictates of unlicensed persons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who were purportedly subjected to them.

217.    Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through ZSP that were not compensable under New York no-fault insurance laws.

218.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $142,000.00 pursuant to the fraudulent bills submitted by Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants in the name of ZSP.

219.    The extensive fraudulent conduct by Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

220.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

221.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 220 above.

222.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

223.    When GEICO paid the bills and charges submitted by or on behalf of ZSP for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

224.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

225.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

226.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $142,000.00.

## TENTH CAUSE OF ACTION
### Against Danyko, Elinson, the Billing Defendants and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

227.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 226 above.

228.    DSP is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

229.    Danyko, Elinson, the Billing Defendants and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of DSP's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that DSP was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and

direction of Danyko, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by DSP.   The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".  Each such mailing was made in furtherance of the mail fraud scheme.

230.   DSP's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in Danyko, Elinson, the Billing Defendants and the John Doe Defendants operated DSP, insofar as DSP is not engaged in a legitimate psychology practice and acts of mail fraud therefore are essential for DSP to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as

does the fact that Danyko, Elinson, the Billing Defendants and the John Doe Defendants continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through DSP to the present day.

231.    DSP has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through DSP in pursuit of inherently unlawful goals, namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

232.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $141,000.00 pursuant to the fraudulent bills submitted through DSP.

233.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Danyko, Elinson, the Billing Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

234.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 233 above.

235.    DSP is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

236.    Danyko, Elinson, the Billing Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of DSP's affairs through a pattern of racketeering activity consisting of repeated violations

of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that DSP was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were provided by a healthcare "practice" that was not at the relevant times, under the control and direction of Danyko, but rather, was secretly owned, operated, managed, and controlled by Elinson, the Billing Defendants and the John Doe Defendants for purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers; (ii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to improper financial arrangements between the Defendants and the Clinics and/or referral sources, and the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; (iii) the billed-for-services were unnecessary and were performed, to the extent they were performed at all, pursuant to predetermined protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (iv) the billed-for-services were not provided in the first instance, and the bills misrepresented to GEICO the nature and the level of services that purportedly were provided in order to inflate the charges submitted to GEICO; and (v) the billed-for-services were (a) provided by unlicensed individual, in contravention of New York law, and/or (b) provided by individuals who were not employed by DSP. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

237. Danyko, Elinson, the Billing Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO

and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

238.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $141,000.00 pursuant to the fraudulent bills submitted through DSP.

239.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
**Against Danyko, DSP, Elinson, the Billing Defendants and the John Doe Defendants (Common Law Fraud)**

240.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 239 above.

241.    Danyko, Elinson, the Billing Defendants and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of DSP's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

242.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    In every claim, the representation that DSP was legitimately owned and controlled by Danyko, when in fact it was owned, controlled and managed by Elinson, the Billing, Defendants and the John Doe Defendants for the purposes of effectuating a large-scale fraud scheme on GEICO and other New York automobile insurers;

(ii)    In every claim, the representation that the services that were billed were actually provided when in fact they were not;

(iii)    In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to unlawful kickback and/or financial arrangements amongst the Defendants and others;

(iv)    In every claim, the representation that the psychological services were provided by Danyko, when in fact the services were provided by unsupervised, unlicensed technicians and independent contractors; and

(v)    In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they performed and billed pursuant to fraudulent predetermined protocols involving the dictates of unlicensed persons and designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who were purportedly subjected to them.

243.    Danyko, Elinson, the Billing Defendants and the John Doe Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DSP that were not compensable under New York no-fault insurance laws.

244.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $141,000.00 pursuant to the fraudulent bills submitted by Danyko, Elinson, the Billing Defendants and the John Doe Defendants in the name of DSP.

245.    The extensive fraudulent conduct by Danyko, Elinson, the Billing Defendants and the John Doe Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

246.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

247.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 246 above.

248.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

249.    When GEICO paid the bills and charges submitted by or on behalf of DSP for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

250.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

251.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

252.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $141,000.00.

## JURY DEMAND

253.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against the Fraudulent Entities, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Fraudulent Entities have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $149,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $149,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against ECNYC, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $149,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against all Defendants, for more than $149,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $142,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G. On the Seventh Cause of Action against Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $142,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H. On the Eighth Cause of Action against ZSP, Zwirblia, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $142,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

I. On the Ninth Cause of Action against all Defendants, for more than $142,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

J. On the Tenth Cause of Action against Danyko, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $141,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K. On the Eleventh Cause of Action against Danyko, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $141,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L. On the Twelfth Cause of Action against DSP, Danyko, Elinson, the Billing Defendants and the John Doe Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $141,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

M.      On the Thirtieth Cause of Action against all Defendants, for more than $141,000.00

in compensatory damages, plus costs, interest and such other and further relief as this Court deems

just and proper.

Dated: January 6, 2023

RIVKIN RADLER LLP

By:     /s/ Barry I. Levy, Esq.
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Allison N. Stapleton, Esq.
        Philip Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

5918125.v3